W. C. PEACOCK & COMPANY, Limited, *v.* REPUBLIC OF HAWAII.

DAVID H. LEWIS and JOHN D. HOLT, doing business under the firm name of LOVEJOY & COMPANY *v.* REPUBLIC OF HAWAII.

ORIGINALS.

SUBMITTED MARCH 29, 1899.            DECIDED MAY 31, 1899.

JUDD, C.J., FREAR AND WHITING, JJ.

The Constitution of the United States was designed to meet the requirements of a sovereign nation and must be construed with reference to recognized principles of municipal and international law; it implies the power to acquire territory by cession or conquest, and that power carries with it all necessary and proper incidental powers; among these is the power, recognized by the law of nations and founded on necessity, to permit, either through inaction or by positive provision, the government of a newly acquired country to continue for such reasonable time as may be deemed necessary and proper by the political department of the acquiring government; and this is so whether the country is acquired by conquest or cession, by treaty or joint resolution.

The Joint Resolution of Congress to provide for annexing the Hawaiian Islands to the United States provided, among other things, that, "Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged." Held, that until such legislation by Congress the government of Hawaii may lawfully collect the customs duties prescribed by its laws, notwithstanding the provisions of the Constitution of the United States that, "all duties, imposts and excises shall be uniform throughout the United States" and "nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another" and even if the words "United States" and "State" in said provisions are to be construed as including, for the purposes of ordinary or permanent legislation, the territory belonging to the United States as well as the several States proper.

### OPINION OF THE COURT BY FREAR, J.

These are actions, the first for $30,315.57, the second for $11,305.06, moneys alleged to have been had and received by the defendant to the use of the plaintiffs respectively, namely, moneys collected by the defendant as customs duties at Honolulu since the annexation of Hawaii to the United States and paid by the plaintiffs under protest. These moneys are alleged to have been collected at divers times in the first complaint from August 15, 1898, to January 26, 1899, and in the second complaint from September 28, 1898, to February 1, 1899. The complaints contain the various allegations required by our statute (Civ. L. Sec. 1535) relating to suits against the government and further allegations to the effect that in pursuance of a Joint Resolution of the Congress of the United States approved July 7, 1898, the Hawaiian Islands did, on August 12, 1898, the date of the transfer of sovereignty, become a part of the territory of the United States; that no military conquest of said islands by the United States has ever taken place; that the said islands have not, nor has the said port of Honolulu, ever been under the control of the military forces of the United States; that more than a reasonable time has elapsed for the Congress of the United States

to legislate concerning the imposition in the Hawaiian Islands of the tariff in force in the United States, and for a collector to assume control of the port of Honolulu in pursuance of such legislation; and that in said Joint Resolution, the said Congress did enact positive legislation concerning the customs laws of the Hawaiian Islands, which legislation is unconstitutional and void.

The defendant demurred in each case on a number of grounds, only one of which is relied on—the general one that the complaint does not state facts sufficient to constitute a cause of action.

The substantial question raised is whether the Hawaiian Government could continue after the annexation of these islands to the United States to collect duties at the rates prescribed by Hawaiian laws in force immediately before annexation, the contention of the plaintiffs being that this is prohibited by the following clauses of the Constitution of the United States:

"All duties, imposts and excises shall be uniform throughout the United States (Art. 1, Sec. 8); "nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another" (Art. 1, Sec. 9).

The Joint Resolution referred to is as follows:

"Joint Resolution to provide for annexing the Hawaiian Islands to the United States.

"Whereas the Government of the Republic of Hawaii having, in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining: Therefore,

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby,

annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America.

"The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition; *Provided,* That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

"Until Congress shall provide for the government of such islands all the civil, judicial, and military powers exercised by the officers of the existing government in said islands shall be vested in such person or persons and shall be exercised in such manner as the President of the United States shall direct; and the president shall have power to remove said officers and fill the vacancies so occasioned.

"The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may exist, or as may be hereafter concluded, between the United States and such foreign nations. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine.

"Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged.

"The public debt of the Republic of Hawaii, lawfully existing at the date of the passage of this joint resolution, including the amounts due to depositors in the Hawaiian Postal Savings Bank, is hereby assumed by the Government of the United States; but the liability of the United States in this regard shall in no case exceed four million dollars. So long, however, as the existing Government and the present commercial relations of the Ha-

waiian Islands are continued as hereinbefore provided said Government shall continue to pay the interest on said debt.

"There shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States; and no Chinese, by reason of anything herein contained, shall be allowed to enter the United States from the Hawaiian Islands.

"The President shall appoint five commissioners, at least two of whom shall be residents of the Hawaiian Islands, who shall, as soon as reasonably practicable, recommend to Congress such legislation concerning the Hawaiian Islands as they shall deem necessary or proper.

"Sec. 2. That the commissioners hereinbefore provided for shall be appointed by the President, by and with the advice and consent of the Senate.

"Sec. 3. That the sum of one hundred thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any money in the Treasury not otherwise appropriated, and to be immediately available, to be expended at the discretion of the President of the United States of America, for the purpose of carrying this joint resolution into effect."

These are two of a number of cases argued at this term which involve questions of the application of various provisions of the Constitution of the United States to territory belonging to the United States and, whether "Territories" strictly speaking or mere possessions, forming part of what Mr. Chief Justice Marshall called the American Empire and yet not a part of the United States, in the more restricted meaning, as composed of the several States proper. It is perfectly clear, from their subject matter or their express language, that some provisions of the Constitution of the United States apply to the States proper only and not to territory merely belonging to the United States. But there are many provisions in regard to which there is a greater or less degree of uncertainty. Of these some, as, for example, several of the amendments, are very general in form, containing nothing within themselves to indicate whether they were intended to limit the power of Congress with respect to whatever territory it might be exercised or to limit it only in so far as the States proper or their inhabitants might be affected. Others, like

those now in question, contain some clue to their intended scope, as, for instance, the words "United States" or the word "State," and yet there is some uncertainty as to whether these words were used in their broader or their narrower sense. And so notwithstanding the amount of thought that has been bestowed upon these questions for more than a century, jurists still differ widely in their views in regard to them. See, for example, the articles by Professors C. C. Langdell of Harvard and S. E. Baldwin of Yale in the Harvard Law Review for February, 1899.

One reason why these questions have not been definitely settled by judicial decisions is because Congress in its general legislation has usually included expressly or by implication the territories with the States, and in its organic acts creating governments for the territories has usually expressly provided that the Constitution of the United States should have the same force and effect in the territories as elsewhere in the United States, and consequently it has often been sufficient in passing upon acts passed by the territorial legislatures to hold that the provisions of the Constitution were in force in the territories by express act of Congress, whether also in force there *per se* or *ex proprio vigore* or not. But in the present case Congress has not extended its general customs laws to Hawaii nor has it extended to Hawaii the provision of the Constitution in question. On the contrary it expressly provided in the Joint Resolution of annexation that:

"Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged."

It is true the resolution contains also the following provision which if standing alone might at least afford ground for argument by implication that the Constitution was intended to be extended to these islands:

"The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of the Unit-

ed States, shall remain in force until the Congress shall otherwise determine."

But this provision is clearly controlled so far as customs laws and regulations are concerned by the more specific provision immediately following it and above set forth. Therefore, while on the one hand we cannot hold that the constitutional provisions in question are in force here on the strength of those decisions which have been based on express acts of Congress purporting to extend the Constitution to the territories, yet on the other hand there is nothing in those decisions to prevent our holding that the provisions in question are not in force here.

It is a general principle that courts should not pass upon difficult and grave questions of constitutional power and declare statutes invalid where this can be avoided. In harmony with this principle we desire to go no further in the present cases than it is necessary to go. And it seems to us that the limits of the field of our discussion may be greatly narrowed by the recognition of a distinction, which we believe there is ample ground to sustain, between territory belonging to the United States whether possessing an organized form of government or not, after Congress has enacted such legislation as amounts in effect to a declaration by that branch of the government that the territory is to be henceforth regarded as fully incorporated into the American Empire and territory in regard to which no such representation has been made by the political department of the government and which may be regarded at least for certain purposes as in a transition state or only inchoately annexed. We do not mean to assert that Congress may lawfully suspend the operation of the Constitution or by inaction lawfully postpone its operation indefinitely where otherwise it would be in force, but merely that the Constitution was framed by reasonable men and with reference to recognized principles and ought therefore to be construed with reference to such principles. To illustrate, the Constitution contains many provisions intended as safeguards of the fundamental rights of life, liberty and property, and yet these may of necessity be entirely disregarded under certain circum-

stances in time of war—not because necessity authorizes a breach of the Constitution, but because it makes that constitutional or lawful which would otherwise be unconstitutional or unlawful, in other words, because it is only another name for a difference of circumstances and the law applicable to one set of circumstances is not applicable to an essentially different set of circumstances.  Expressed in another way, the Constitution itself provides for a state of war as well as a state of peace and the law applicable to a state of war, as determined by the usages and customs of nations, differs from the law applicable to a state of peace.

Similarly, the Constitution contemplates the acquisition of territory, and that too either by cession or by conquest.  This is necessarily implied from the power to make treaties and the power to declare war.  And whether one of these methods of acquiring territory or the other is pursued the recognized and appropriate rules applicable to such cases may be followed.  For instance, the Joint Resolution annexing these islands to the United States, regarded as an Act of Congress, would in accordance with the general rule applicable to acts of Congress, no other date being named, take effect upon its approval by the President, July 7, 1898.  Indeed, it purports to take effect at once.  It is in the present tense.  The islands "are hereby annexed."  And yet no one would seriously contend that annexation took place before the transfer of sovereignty, August 12, 1898.  For, although the United States may acquire territory by joint resolution of Congress under the Constitution (at least it does not lie with this court to hold the contrary) and although Congress purported to annex these islands in that manner forthwith, yet both the Constitution and the Joint Resolution must be taken to have been adopted with reference to the recognized principles of municipal and international law, one of which is that, after the analogy of a deed of real property, a change of sovereignty does not ordinarily take effect until delivery.  Chancellor Kent says:

"With respect to the cession of places or territories by a treaty of peace, though the treaty operates from the making of it, it is

a principle of public law that the national character of the place agreed to be surrendered by treaty continues as it was under the character of the ceding country, until it be actually transferred. * * * The practice of nations has been conformable to this principle, and the conventional law of nations is full of instances of this kind." 1 Com. 177.

It is therefore conceded that the Constitution did not take effect here until at least a month and five days after the Joint Resolution became law, although that Resolution was in the present tense and although by its terms no further act such as a formal transfer of possession or sovereignty or a proclamation by the President was required to complete annexation. Hence it is alleged in the complaint that these islands were annexed on August 12, 1898, not on July 7, 1898.

Again, suppose these islands had been acquired by conquest instead of by cession, as was the case with Puerto Rico and the Philippines. In such case also, as is conceded, the Constitution would not be in force at least until further action by the law-making or the treaty-making power. Until then the islands would be under military rule and occupation by the executive as commander-in-chief. And yet the islands would in a certain sense belong to the United States. They would not be independent or belong to any other power. Other nations would be obliged to treat them as belonging to the United States but they would not be regarded in all respects a part of the United States as to matters of internal administration. They would in other words be regarded as a part of the American Empire for some purposes and not for other purposes. They would not be fully incorporated as a part of the United States. The commander-in-chief might even yield them up to their former owner or abandon them without consulting Congress. The Constitution in providing for a state of war contemplates the usages and customs of war—founded on necessity. Hence, it is alleged in the complaint that no military conquest of these islands by the United States has ever taken place and that the islands have never been under the control of the military forces of the United States.

But let us go a step farther. How would it be after a treaty

of peace had been negotiated and ratified, formally ceding the conquered territory to the United States, and until Congress should provide a government for it or enact other legislation in regard to it? Would the Constitution extend to it forthwith *ex proprio vigore,* with the result that crime could not be suppressed because there was no provision for a grand jury or for unanimous verdicts by petit juries, and questions of private right could not be settled for the same reason that there was no provision for unanimous verdicts, and the right of the people, however hostile, to keep and bear arms, could not be infringed, and trade with other countries might be suspended because there was no law extending the United States shipping and customs laws to the newly acquired territory and no machinery for the collection of duties under United States laws, and vessels registered under the laws of the acquired territory would be without a flag, and so that, in a word, there would be anarchy in place of order? If the Constitution would not extend forthwith to newly acquired territory in case of conquest and treaty of peace, is there any reason why it should in case of an acquisition by cession alone? It may be that there would be a difference between the two cases as to the powers of the President without further authority from Congress, such as, by the way, was given in the Joint Resolution in question, and also as to the body of laws that would remain in force until further act of Congress, but could there be any difference founded in reason as to whether the Constitution extended in all respects to the newly acquired territory immediately? It seems to be conceded that there is at least room for argument that in a case of conquest and perhaps also in a case of cession, the Constitution would not be extended until Congress had had a reasonable time in which to act, for it is alleged in the complaint that more than a reasonable time has elapsed for the Congress of the United States to legislate concerning the imposition in the Hawaiian Islands of the tariff in force in the United States and for a collector to assume control of the port of Honolulu in pursuance of such legislation. But, assuming that Congress were bound to enact within a reasonable time suitable legis-

lation so that the provisions of the Constitution could be enforced and if, after the analogy of the practice of courts in taking question from juries or setting aside their verdicts in extreme cases or in reviewing the exercise of discretion by inferior courts in case of abuse, it should be assumed that the courts could review the decision of Congress as to what is a reasonable time, in case it should long defer action, can any pretense be made that such action has been deferred unreasonably in the present instance? The Joint Resolution of annexation was passed just before adjournment in July, 1898. Provision was made in the Resolution itself for the appointment of a commission to recommend suitable legislation "as soon as reasonably practicable." The commission was appointed forthwith and completed its labors in time to submit its report to the President before the next session of Congress and the President transmitted it to Congress immediately after it convened. A bill embodying the legislation recommended was at once introduced in each branch of Congress and referred to committees. The committees entered upon their work at once and continued it without unnecessary interruption until they had finished it and then immediately reported the bills. If the bill had been given right of way over all other business, as soon as it was reported back to the House, had been passed immediately without debate or conference, telegraphed at once to San Francisco and sent to Honolulu by the first steamer sailing thereafter, it would not have arrived here until the last day mentioned in one of the complaints and five days after the last day mentioned in the other complaint. As matter of fact the bill was not passed at that session but it was the short session and there was an unusual amount of other important business to occupy the time at the disposal of Congress. We are of the opinion however that the question of what is a reasonable time in a case of this kind, if such a question is involved at all, is one entirely within the discretion of Congress and one with which the courts have nothing to do.

But to return to the question whether any distinction can be made between cases of conquest followed by treaty and cases of

cession, with reference to whether the Constitution extends to the new territory at once or only after Congress has indicated that it is to be regarded as fully incorporated into the American Empire. What reason can be assigned for any such distinction? If the Constitution is not in force in the newly acquired territory at once, in either case, is it not because of necessity—a necessity with reference to which and to the recognized principles growing out of it, the Constitution must be presumed to have been framed? Can it be said that there is not the same necessity in the case of cession as in the case of conquest, because in the former case time may be taken to provide for a change of laws and government before the cession is made? Could it not be said with equal force that such time might be taken before the ratification of a treaty of peace in case of conquest? Indeed, could not the United States, as a nation with the powers of a nation, stipulate in the treaty of peace for the cession of territory not conquered or occupied though belonging to the vanquished enemy and yet could it be reasonably contended that in such case the ratification of the treaty should be postponed until suitable legislation could be enacted for the new territory? The framers of the Constitution were reasonable men and did not intend anything ridiculous or futile or to provide for a nation without ordinary national or sovereign powers. But even in the case of a pure cession not preceded by war with the ceding power, can it be said that there is always or even usually ample time for the enactment of suitable legislation without the danger of working great injustice through hasty action? The history of the United States would seem to indicate that territory is apt to be acquired by cession suddenly rather than after options obtained for a length of time sufficient to provide permanently for the interests of the territory. Nations are usually obliged to take territory by cession, if at all, when they can get it or when the ceding power is willing to part with it. The annexation of these islands themselves was effected suddenly and at that particular time owing largely to very extraordinary circumstances that arose suddenly. The purposes for which territory may be acquired are manifold and

among them are many which may admit of no delay on the part of the acquiring nation, to say nothing of the possibility of a change of plans on the part of the ceding nation. Hence, the power to acquire territory by cession, like that to acquire territory by conquest, carries with it all necessary and proper incidental powers. Indeed, in the case of cession there may be reasons for the rule in question that may not exist in a case of conquest. For, in a case of cession the ceding nation must be consulted and may not be willing to cede except on condition, or with the understanding, that no changes are to be made in the laws of the ceded territory with undue haste, and at the same time the people of the ceded territory are the ones for the time being concerned and if they are willing to remain for a time under the laws they have themselves made and become accustomed to there can be no objection to permitting this, so far as mere reason is concerned.

But it is argued further that Congress has already acted in this case. It is alleged in the complaint that in the Joint Resolution Congress did enact positive legislation concerning the customs laws of the Hawaiian Islands, which legislation, it is also alleged, is unconstitutional and void. Reference is here made to the clause in the Joint Resolution which provides that,

"Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged."

Now, in the first place, the mere fact that Congress has taken some action in regard to newly acquired territory is not sufficient to indicate that in its opinion such territory has become or ought to be considered fully incorporated into the American Empire. If annexation is accomplished by joint resolution, that of itself is action by Congress with reference to the territory acquired. That is not sufficient. There must be legislation of such extent or of such character as to indicate that in the opinion of Congress the territory has become essentially a part of the United States. The legislation must be something more than of a mere tempo-

rary or provisional character. If the clause of the Joint Reso-
lution referred to indicates anything, it indicates, especially when
taken in connection with other clauses, that Congress was of the
opinion that it was not then in a position to make permanent pro-
vision for these islands and that it needed further light and fur-
ther time to enable it to do so. In the second place, this legisla-
tion continuing Hawaiian customs relations cannot be held un-
constitutional and void as positive independent legislation in con-
travention of the clause of the Constitution in question. The
Joint Resolution must be treated as a whole. It is an attempt
to annex these islands to a certain extent or for certain purposes
for the time being, full annexation to be completed at a later
period. Not but that the sovereignty of these islands was in-
tended to pass wholly to the United States. But an attempt was
made to create a relation between the United States and these
islands in some respects similar to that between the United States
and conquered territory under military occupation, in which case
the territory is regarded as United States territory by foreign
nations but is still regarded for certain purposes at least as foreign
territory by the United States, although the source of the Presi-
dent's power to act in the two cases may be different. Territory
may be annexed by treaty whether by treaty of peace or treaty in
time of peace. Is this power limited by the Constitution as to
the extent to which, the character in which, or the purposes for
which the territory may be acquired? May it not be acquired to
as full or to as limited an extent as the purposes for which it is
desired require? It may be annexed as a state, as an organized
territory, as an unorganized territory, or for the purposes of a
naval station or a cable landing, or for any one of a thousand
other purposes. A protectorate even might be assumed over it
without annexation as that term is generally understood, al-
though it would in a certain sense practically amount to annexa-
tion to a certain extent or for certain purposes. Where is the
line to be drawn? May not territory be permanently acquired
by treaty to a certain extent or for certain purposes and not for
other purposes. Let us assume not, for the sake of argument.

Still, is the manner in which the territory may be acquired by treaty limited? If the United States needs certain territory for certain purposes immediately and may constitutionally acquire and hold it for all purposes permanently but cannot immediately enact the legislation requisite in case the Constitution should be extended at once and the ceding power will not consent to an immediate cession unless its own laws continue so that life, liberty and property may be protected until such time as Congress can substitute other appropriate laws consistently with the Constitution of the United States, could not the cession take place *sub modo* or for certain purposes immediately and all purposes ultimately? Would not this be an appropriate method of accomplishing a constitutional end? Or must it be said that the United States with the power to make treaties, with the power to acquire territory and with the usual attributes of sovereignty could not acquire the territory in question merely because it could not acquire it in a particular mode,—the only mode in which it could be acquired in the given case? And if territory may be so acquired by treaty, it may be so acquired by joint resolution, if it may be acquired at all by joint resolution. The method of acquiring territory by joint resolution is no more limited than that of acquiring it by treaty. The clause continuing Hawaiian customs relations is not to be regarded as independent positive unconstitutional legislation inconsistent with the remaining portion of the Resolution but as, in connection with the remaining portion of the Resolution, indicating an intention to effect annexation for the time being to only a certain extent, though it contemplates the extension of the United States customs laws in full at a subsequent date. This view is strengthened by the fact that the Joint Resolution is in the nature of a contract between two parties although passed by one of the parties alone. It is in almost the exact language of a treaty of annexation negotiated between the governments of the United States and Hawaii and ratified by the Hawaiian Senate but not by the Senate of the United States. It purports, as shown by the recital and first part of the Resolution, to be an acceptance of the offer contained in the

treaty ratified by the Hawaiian Senate. The Hawaiian government assented only to the terms set forth in the resolution.

We have endeavored thus far to show that the Constitution of the United States was framed by reasonable men to provide for the requirements of a sovereign nation and must be construed with reference to recognized principles; that, construed with reference to those principles, all its provisions that may be ultimately applicable to acquired territory do not necessarily extend to it of their own force immediately upon conquest, or the ratification of a treaty or the passage of a joint resolution of annexation; that this is well settled in certain cases, as, for instance, in case of cession until transfer of possession and in case of conquest until treaty of peace; that there is much reason to believe that it may be so even after transfer of possession or treaty of peace until such action is taken by Congress as indicates that incorporation of the new territory into the United States is regarded as completed; that there is no distinction in this respect founded in reason between a cession in a treaty of peace and a cession by treaty in time of peace, or between a cession by treaty and a cession in pursuance of a joint resolution, and that the power to acquire by treaty or joint resolution as well as the power to acquire by conquest carries with it all necessary and proper incidental powers, one of which may be the temporary continuation of the laws of the acquired territory though inconsistent with certain specific provisions of the Constitution, the duration of which temporary status is within the discretion of Congress. In drawing a distinction between territory fully incorporated and territory incorporated only *sub modo* in the American Empire, we do not wish to be understood as expressing an opinion one way or the other as to whether after such territory has become fully so incorporated the provisions of the Constitution in question are in force there *ex proprio vigore* or not. We assume merely for the purposes of argument that they are.

It remains to examine the precedents to some extent.

In England the rule seems to be that in case of territory acquired by right of discovery, the laws of England so far as appli-

cable are at once in force, because there are no other laws in force. In case of a conquered territory the king without the consent of parliament, and in case of ceded territory with the consent of parliament, may make new laws but until he does the old laws remain in force.  Says Blackstone (1 Com. 107):

·"In conquered or ceded countries, that have already laws of their own, the king may indeed alter and change those laws; but, till he does actually change them, the ancient laws of the country remain, unless such as are against the law of God."

No distinction was made between conquered and ceded countries as to whether the old laws remained in force until changed by the acquiring country.  In *Blankard v. Galdy*, 2 Salk. 411, the court said:

"That it was impossible the laws of this nation, by mere conquest, without more, should take place in a conquered country; because, for a time there must want officers, without which our laws can have no force."

This reasoning applies with equal force to ceded countries. See also *Calvins Case*, 7 Rep. 17; 2 P. Wms. 75; *Campbell v. Hall*, Cowp. 204; *Attorney-General v. Stewart*, 2 Meriv. 143.

Now let us turn to the United States.  Chancellor Kent says (1 Com. 178 note (a) ):

"The laws, usages, and municipal regulations in force at the time of the conquest or cession, remain· in force, *until changed by the new sovereign.*"  The italics are his.

The first acquisition of territory by the United States was by cession.  The vast territory of Louisiana was ceded by France to the United States by treaty concluded April 30, 1803, the ratifications of which were exchanged at Washington October 21, 1803, and proclaimed the same day.  It was provided in Article III. of this Treaty that,

"The inhabitants of the ceded territory *shall be incorporated* in the Union of the United States, *and admitted as soon as possible,* according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; *and in the meantime* they shall be

maintained and protected in the free enjoyment of their liberty, property and the religion they profess."

And in Article VII, that,

"As it is reciprocally advantageous to the commerce of France and the United States to encourage the communication of both nations *for a limited time in the country ceded* by the present treaty, *until general arrangements* relative to the commerce of both nations *may be agreed upon;* it has been agreed between the contracting parties, that the French ships coming directly from France or any of her colonies, loaded only with the produce and manufactures of France or her said colonies; and the ships of Spain coming directly from Spain or any of her colonies, loaded only with the produce or manufactures of Spain or her colonies, shall be admitted during the space of *twelve years* in the port of New Orleans, and in all other legal ports of entry within the ceded territory, in the same manner as the ships of the United States coming directly from France or Spain, or any of their colonies, without being subject to any other or greater duty on merchandise or other or greater tonnage than that paid by the citizens of the United States."

And that,

"*During the space of time above mentioned,* no other nation shall have a right to the same privileges in the ports of the ceded territory."

The treaty thus provided somewhat as it is provided in the Resolution annexing Hawaii, for the continuation of the municipal laws of the territory in general until further action by Congress, and contained special provisions relating to customs and shipping matters.   On October 31, 1803, Congress passed an Act to enable the President to take possession of the ceded territory, in which Act it was provided, much as in the Resolution annexing Hawaii:

"That until the expiration of the present session of Congress, unless provision for the temporary government of the said territories be sooner made by Congress, all the military, civil and judicial powers, exercised by the officers of the existing government of the same, shall be vested in such person and persons, and shall be exercised in such manner, as the President of the United States shall direct for maintaining and protecting the inhabitants

of Louisiana in the free enjoyment of their liberty, property and religion."

Possession was delivered December 20, 1803. It was not until the passage of the Act of February 24, 1804, which took effect thirty days later still, that Congress extended the United States customs and shipping laws over Louisiana (Sec. 1) and repealed the "laws laying any duties on the importation into the United States of goods, wares and merchandise from the said territories * * * or respecting the commercial intercourse between the United States and the said territories" (Sec. 3); and in that Act (Sec. 8) special provision was made, in accordance with the requirements of the treaty, for French and Spanish ships and goods. 2 Sts. at L. 251. It was not until March 24, 1804, that an Act was passed providing for the government of the territory. 2 Sts. at L. 283. Upon the passage of the Act of October 31, 1803, says Judge Baldwin, in his article already referred to, p. 396:

"Jefferson immediately dispatched commissioners to New Orleans to receive the surrender of possession, and invested one of them, Governor Claiborne, of the Territory of Mississippi, with all the powers theretofore exercised over the Louisiana territory by the Governor General and Intendant under the authority of the King of Spain. This made him a temporary king, and constituted the system of government under which Louisiana remained until October of the following year. The Governor General, under the laws and usages of Spain, had almost royal authority. He promulgated ordinances which had the force of a statute. He appointed and removed at pleasure commanders over each local subdivision of territory. He presided over the highest court. * * * Judicial proceedings were conducted in the forms of the civil law. * * He who reviled the Saviour or the Virgin Mary, had his tongue cut out and his property confiscated. A married woman convicted of adultery and her paramour were to be delivered up to the will of the husband, with the reserve, however, that if he killed one he must kill both. All travellers, previous to circulating any news of importance, were bound to relate it to the syndic of the district, who might forbid it to go further if he thought such prohibition would be for the public good. There was a religious establish-

ment.  Two canons and twenty-five curates received salaries from the public treasury."

Somewhat similarly upon the annexation of Hawaii the President of the United States invested officers with the powers theretofore exercised by the officers of Hawaii.  There were these incidental points of difference.  In the case of Hawaii these powers were continued in the same officers who had previously exercised them, and the laws of Hawaii while different in their particular provisions were for the most part of an advanced character and in harmony with the spirit of the Constitution and laws of the United States.  The history of the cession of the Louisiana territory and the legislation following it shows that the legislative and executive departments of the federal government construed the Constitution as permitting the acquisition of territory under special temporary treaty provisions apparently inconsistent with certain provisions of the Constitution, and the continuation of the government of such territory under the laws then existing there until such time as other laws could be enacted in harmony with the supposed requirements of the Constitution.  It is true that the debate over this legislation was directed rather to the question of the general power of acquiring territory and the general powers over it when acquired rather than to what could be done in a provisional way.  And yet the treaty and the legislation following it, in so far as they were not in harmony with the alleged requirements of the Constitution, were in fact of a provisional character.  Indeed, the members of each of these departments were hard pressed for consistent arguments in support of whatever view they undertook to defend.  We know what they did, whatever they said.  If they did not distinguish sufficiently between permanent and temporary provisions, then they committed themselves to the larger proposition that the provisions of the Constitution in question did not apply at all or at any time to territory belonging to the United States and not to the narrower proposition that they applied immediately.  But the position was taken in argument that whatever might be the extent of the power to legislate in the absence of a treaty provision requiring

temporary supposedly unconstitutional legislation, yet the right to acquire involved the right to give the equivalent demanded, and therefore the provision of the treaty giving special privileges in respect of customs duties and shipping for twelve years could be supported as part of the price of the territory. 2 Adams, Hist. U. S. 99. Finally those who advocate the doctrine that the provisions or most of the provisions of the Constitution involved in the controversy extend of their own force to the territories regard it as settled that temporary provisions may be made for newly acquired territory, of a character of which it is unsettled whether permanent provisions could be made. For instance Judge Baldwin, in his article already referred to, pp. 411, 412, says that while questions as to what may be done permanently are "unsettled so far as we can consult the oracles of the past," yet that,

"There is no constitutional objection to the acquisition of any or all of our new possessions, or to subjecting them to a temporary government of military or colonial form.     *     *     *     Until Congress acts, the President can govern our new possessions. *     *     *     Upon the ratification of the treaty, Puerto Rico would become (and for the first time become) a part of the United States, but our customs laws would not have full operation there until Congress created the necessary collection districts and ports of entry. Until then, the temporary government of the President would continue; duties on imports could be lawfully collected by his agents; and whatever courts of a municipal character he may have set up would continue in the discharge of their functions, with the power of life and death."

We have referred at some length to the case of Louisiana because that was a case of pure cession as distinguished from conquest and the course then pursued was much like that pursued in the case of Hawaii and it was the first case of acquisition of territory by the United States and was effected in large measure by the very men who framed the Constitution and who were many of them the most ardent of the strict constructionists. The construction thus put upon the Constitution by the legislative and executive departments seems to have been acquiesced in. The judiciary, so far as we are aware, were not called upon for an

expression of opinion until the next acquisition of territory by cession.

The Floridas were ceded to the United States by Spain by treaty dated February 22, 1819, of which the ratifications were exchanged at Washington February 22, 1821, and proclaimed the same day. The treaty and the statutes passed afterwards contained provisions somewhat like those already referred to in the case of Louisiana. The President appointed a governor invested with the powers and charged with the duties theretofore exercised by the Captain-General and of the Intendant of the island of Cuba over the Floridas. A case, *American Insurance Co. v. Canter*, arose subsequently, decided in 1828, which called forth expressions of opinion upon the question now under discussion. It was held that admiralty cases were not cases arising under the Constitution and laws of the United States and that the courts created for the territory of Florida were not constitutional courts but legislative courts, that is, that the provisions of the Constitution relating to judicial power did not apply at all to the territories. But without going so far as the decision of the court in that particular case logically requires, we wish to call attention to the opinion that was expressed as to what laws are in force immediately after annexation or cession. The Circuit Justice (1 Fed. Cas. 559, 660; 1 Pet. 517 note), said:

"It becomes indispensable to the solution of these difficulties that we should conceive a just idea of the relation in which Florida stands to the United States.     *     *     *     It is obvious that there is a material distinction between the territory now under consideration and that which is acquired from the aborigines, (whether by purchase or conquest) within the acknowledged limits of the United States, as also that which is acquired by the establishment of a disputed line. As to both these there can be no question that the sovereignty of the state or territory within which it lies, and of the United States immediately attach, producing a complete subjection to all the laws and institutions of the two governments, local and general, unless modified by treaty. The question now to be considered relates to territories previously subject to the acknowledged jurisdiction of another sovereign; such as was Florida to the crown of Spain. And on

this subject we have the most explicit proof that the understanding of our public functionaries is, that the government and laws of the United States do not extend to such territory by the mere act of cession."

And after referring to the legislative power and the treaty power, he continued:

"By the latter we acquire either positively or *sub modo*, and by the former dispose of acquisitions so made; and in case of such acquisitions I see nothing in which the power acquired over the ceded territories can vary from the power acquired under the law of nations by any other government over acquired or ceded territory. The laws, rights, and institutions of the territory so acquired remain in force until rightfully altered by the new government."

On appeal the Supreme Court, per Mr. Chief Justice Marshall (1 Pet. 542, 544) said:

"The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed; either on the terms stipulated in the treaty of cession, or on such as its new master shall impose. On such transfer of territory, it has never been held, that the relations of the inhabitants with each other undergo any change. Their relations with their former sovereign are dissolved, and new relations are created between them, and the government which has acquired their territory.    *    *    *    All the laws which were in force in Florida while a province of Spain, those excepted which were political in their character, which concerned the relations between the people and their sovereign, remained in force until altered by the government of the United States."

It will be noticed that the court considered that the acquisition of territory by the United States was governed by the general rules applied by other nations in similar cases, that no distinction was made between a case of cession and a case of conquest, that it was considered competent to make special stipulations in the treaty,—for a cession absolute or *sub modo*—and that the laws

4

already in force, not of a political character, remained in force until changed by the new sovereign.

In *Mitchel v. U. S.*, 9 Pet. 711, (1835) a case which arose in regard to land titles in East Florida, the same court said, pp. 733, 748:

"According to the established principles of the laws of nations, 'the laws of a conquered or ceded country remain in force till altered by the new sovereign."

See also *Strother v. Lucas*, 12 Pet. 410, 436 (1838) a case relating to land titles under the Louisiana cession.

In *Fleming v. Page*, 9 How. 603 (1849) it was held that the port of Tampico in the state of Tamaulipas, captured by the United States in the Mexican war, and held under military occupation, remained foreign territory within the meaning of the customs laws of the United States, although it was subject to the sovereignty and dominion of the United States and had to be regarded by other nations as part of the territory of the United States. That was a case of military occupation, but in discussing this question the court, per Mr. Chief Justice Taney, pp. 616, 617, said:

"This construction of the revenue laws has been uniformly given by the administrative department of the government in every case that has come before it. And it has, indeed, been given in cases where there appears to have been stronger ground for regarding the place of shipment as a domestic port. For, after Florida had been ceded to the United States, and the forces of the United States had taken possession of Pensacola, it was decided by the treasury department, that goods imported from Pensacola before an act of Congress was passed erecting it into a collection district, and authorizing the appointment of a collector, were liable to duty. That is, that, although Florida had, by cession, actually become a part of the United States, and was in our possession, yet, under our revenue laws, its ports must be regarded as foreign until they were established as domestic, by act of Congress; and it appears that this decision was sanctioned at the time by the attorney-general of the United States, the law officer of the government. And, although not so directly applicable to the case before us, yet the decisions of the treasury department in relation to Amelia Island, and certain ports in

Louisiana, after that province had been ceded to the United States, were both made upon the same grounds.     *     *     *
The department in no instance that we are aware of, since the establishment of the government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress. The principle thus adopted and acted upon by the executive department of the government, has been sanctioned by the decisions in this court and the circuit courts whenever the question came before them."

In *Calkin v. Cocke*, 14 How. 227 (1852) the question arose whether the customs laws of the United States took effect immediately upon the annexation of Texas. The Republic of Texas was annexed, as was Hawaii, by joint resolution, but it was annexed directly as a state on an equal footing with the original states. This was on December 29, 1845. On the same day Congress passed an act extending all the laws of the United States over Texas and two days later another act erecting the state into a collection district. It seems to have been taken for granted that the question was merely one of intention and not of constitutionality whether the customs laws of Texas remained. in force or were superseded immediately by those of the United States and that provision might properly have been made in the joint resolution for a continuation of the Texan laws, temporarily. The court said p. 236:

"Now it is quite apparent, from the joint resolution of Congress, admitting the State of Texas into the Union, and the acts passed, organizing the federal courts and revenue system over it, that the old system of government, so far as it conflicted with the federal authority, became abrogated immediately on her admission as a State. This is clearly so, unless some provision is found in the act of admission, postponing the time when it shall take effect, and as applied to the case before us, postponing it until after the 31st January, 1848, when these goods were shipped to the port of Galveston."

The case of *Cross v. Harrison*, 16 How. 164 (1853) arose in connection with the cession of California. Early in 1847, soon after the conquest of California by the United States, the mili-

tary authorities set up a civil government and laid and collected customs duties. On February 3, 1848, the treaty of peace was concluded by which California was ceded to the United States by Mexico. The ratifications were exchanged May 30, 1849, but, owing to the time required to convey the information to California, they were not proclaimed there until August 7, 1848. Two days later, August 9, 1848, the military authorities substituted the United States tariff for the war tariff previously imposed by them. On September 3, 1848, the governor appointed a new collector, the defendant Harrison. On March 3, 1849, Congress passed an act including San Francisco in one of the collection districts of the United States. On November 30, 1849, a new collector regularly appointed by the President under the Act of Congress entered upon his duties. The case received much consideration by both counsel and the court. The opinion is not altogether satisfactory. The court actually held that if the United States customs laws did not take effect in California immediately upon its cession and if the laws imposed by the military authorities were not in force because unconstitutional, then there was no right whatever to enter the goods in question in California and they would have to be entered at some port of entry elsewhere in the United States before they could be lawfully brought into California and that since the military authorities had refused to receive the duties under protest and had given the importer the privilege of entering the goods and paying duty on them elsewhere and then bringing them into California free of duty and the importer rather than to do this had chosen to pay the duties in California, his doing so must be considered voluntary and therefore assumpsit would not lie to recover them. The decision on this point was sufficient to dispose of the case and therefore the remainder of the opinion may be considered as unnecessary. But it was to the points covered by this remainder that both court and counsel directed most attention. The court expressed the view that the formation of the civil government by the military authorities before peace was concluded was a lawful exercise of the rights of a conqueror under the laws of

nations, and that such government was undoubtedly operative until the treaty of peace and cession was concluded and ratified and further until notice of the exchange of ratifications reached California. No particular attention was paid to the two days from the time the treaty was proclaimed in California until the change of duties by the military authorities to the rates prescribed by United States laws. The main question related to the period from notice of the treaty until the passage of the act of Congress, during which period the rates were prescribed (though the same in amount as those imposed by the laws of the United States) and the duties collected under the government set up by the military authorities. On this point the court said, pp. 193, 195:

"The government of which Colonel Mason was the executive, had its origin in the lawful exercise of a belligerent right over a conquered territory.   *   *   *   It was the government when the territory was ceded as a conquest, and it did not cease, as a matter of course, or as a necessary consequence of the restoration of peace. The President might have dissolved it by withdrawing the army and navy officers who administered it, but he did not do so. Congress could have put an end to it, but that was not done. The right inference from the inaction of both is, that it was meant to be continued until it had been legislatively changed.   *   *   *   Whatever may have been the causes of delay, it must be presumed that the delay was consistent with the true policy of the government.   *   *   *   Our conclusion, from what had been said, is, that the civil government of California, organized as it was from a right of conquest, did not cease or become defunct in consequence of the Treaty or from its ratification. We think it was continued over a ceded conquest, without any violation of the Constitution or laws of the United States, and that until Congress legislated for it, the duties upon foreign goods imported into San Francisco were legally demanded and properly received."

The court implied also that in its opinion it might properly have been expressly stipulated in the treaty that the United States customs laws should not take effect at once in California, p. 197. It must be admitted, however, that there are some passages in the opinion that seem to be inconsistent with these views.

In *Leitensdorfer v. Webb*, 20 How. 176 (1857), it was held that the government established in New Mexico by the military authorities of the United States upon the conquest of that country in 1846 continued in force after the termination of the war until changed by or in pursuance of act of Congress. See also *Hamilton v. Dillon*, 21 Wall. 73, 88.

On the whole, while the actual decisions may be generally accounted for on other grounds and while the dicta are not always consistent and not always favorable to the proposition that upon the acquisition of territory the Constitution in all its fulness may not immediately extend to it, either because of the inaction of Congress or because of express provisions in the treaty or joint resolution of annexation, yet the prevailing view seems to support this proposition and it certainly seems founded on good sense and has been uniformly followed in practice. We hardly need to refer to the more recent cases of Puerto Rico and the Philippines.

It is therefore our opinion that the duties in question were lawfully collected. It will be unnecessary to consider several minor points that were raised in argument.

The demurrers are sustained and the complaints dismissed with costs.

*Kinney, Ballou & McClanahan* for plaintiffs.

*Attorney-General H. E. Cooper, Deputy Attorney-General E. P. Dole* and *R. D. Mead* for defendant.