*Carl S. Smith* and *J. W. Cathcart* for plaintiff.

*F. W. Hankey* for defendants.

---

## EX PARTE EDWARDS.

SUBMITTED JULY 9, 1900.          DECIDED OCTOBER 9, 1900.

FREAR, C.J., GALBRAITH, J., AND HUMPHREYS, CIRCUIT JUDGE,
IN PLACE OF PERRY, J., ABSENT.

The Congress of the United States by a Joint Resolution, "To Provide for annexing the Hawaiian Islands to the United States," approved July 7th, A. D. 1898, provided, *inter alia*, that "the municipal legislation of the Hawaiian Islands  *  *  *  *  not inconsistent with this joint resolution nor contrary to the Constitution of the United States  *  *  *  *  shall remain in force until the Congress of the United States shall otherwise determine." On August 12th, A. D. 1898, there were certain ceremonial functions held in Honolulu at which the Hawaiian Government was formerly notified by the United States Minister Plenipotentiary and Envoy Extraordinary of the adoption and approval of the joint resolution aforesaid and at which the Hawaiian Government made an unequivocal transfer and cession of its sovereignty and property.   Held—

(1)   That by virtue of the language of the Joint Resolution above quoted all municipal legislation of the Hawaiian Islands contrary to the Constitution of the United States was *ex vi verbae* and not by implication merely, annulled and ceased to be of force or effect after the 12th day of August, A. D. 1898.   The question as to whether the joint

resolution took effect so as to operate as a repeal of Hawaiian municipal legislation, contrary to the Constitution of the United States, at the date of its approval or on the 12th day of August, A. D. 1898, is one not necessary to the decision of this case.

(2)   No person could be put upon trial for an infamous crime in the Hawaiian Islands after August 12th, 1898, without having been first indicted by a grand jury; nor could one be convicted of such crime save by the unanimous verdict of twelve jurors.

(3)   Section 616 of the Penal Laws of 1897 providing for the finding of an "indictment" by a Circuit Judge, and that part of Section 1345 of the Civil Laws of 1897 authorizing nine jurors to return a verdict in criminal cases is municipal legislation contrary to the Constitution of the United States and is null and void.

(4)   Sodomy is "an infamous crime" within the meaning of the Fifth Amendment to the Constitution of the United States.

(5)   The petitioner in this case having been put to his trial on the 16th day of August, A. D. 1898, upon an "indictment"—so-called, found by a circuit judge, charging him with the crime of sodomy and thereof convicted by a verdict less than unanimous, is entitled to be discharged.

OPINION OF THE COURT BY GALBRAITH, J.

(Frear, C.J., dissenting.)

This was an original proceeding on a writ of habeas corpus issued on the petition of George L. Edwards, and the return thereto.

The petitioner was charged on an indictment found by the Circuit Judge of the First Circuit, Island of Oahu, Hawaiian Islands with the offense of an attempt to commit sodomy; was tried and convicted on the 16th day of August, A. D., 1898, by the concurrence of ten of the twelve jurors, and sentenced by the court to imprisonment at hard labor for a term of five years. The return admits that he is now held in the Oahu Prison, Territory of Hawaii, under the commitment issued in pursuance of the conviction and sentence as alleged in the petition.

The indictment against the petitioner was returned under Sec. 616 of the Penal Code of 1897 of the Republic of Hawaii, which reads: "The necessary bills of indictment shall be duly prepared by a legal prosecuting officer, and be duly presented to

3

the presiding judge of the court before the arraignment of the accused, and such judge shall, after examination, certify upon each bill of indictment whether he finds the same a true bill."

The provision of the code relative to the verdict of juries reads as follows: "Sec. 1345. No jury for the trial of any case civil or criminal, shall be less than twelve in number; but when nine of the jury shall agree upon a verdict, they may render the same and such verdict shall be as valid and binding upon the parties as if rendered by all twelve."

It is contended by the petitioner that his indictment, conviction and sentence were void, and his detention is now illegal, in this that he was placed upon trial for an infamous crime without an indictment by a grand jury and was convicted by the minority verdict of a jury and thus denied the rights and privileges guaranteed him under the 5th and 6th Amendments of the Constitution of the United States.

It is contended on behalf of the Territory that the petitioner was legally convicted under the laws of the Republic of Hawaii, that no act of Congress had, at that time, extended the Constitution and laws of the United States to the Hawaiian Islands, and that these amendments, or any other parts of the Constitution of the United States, were not in force on the Hawaiian Islands, at the time of his conviction and sentence, to-wit, Aug. 16th, 1898.

In passing upon the question raised in this case we cannot overlook the history of the long and laborious struggle for the Annexation of the Hawaiian Islands to the United States, extending over a period of nearly half a century and ending with the passage of the Joint Resolution by the United States Congress and its approval by President McKinley on the 7th day of July A. D. 1898; nor forget the fact that one of the strong arguments for annexation was that American civilization had long been established in these islands and its people and institutions would easily and naturally adapt themselves to and be assimilated with American law and government.

The constitution of the Republic of Hawaii, adopted in 1894, contained this provision: "The President, with the approval of the Cabinet, is hereby expressly authorized and empowered to

make a Treaty of Political or Commercial Union between the Republic of Hawaii and the United States of America, subject to the ratification of the Senate." Art. 32.

A treaty of annexation was negotiated by the Representatives of the United States and the Republic of Hawaii in February 1893, and withdrawn from the consideration of the United States Senate by the President, in March following, and another treaty was made on June 17th, 1897. This last treaty was pending before the United States Senate for ratification when the Joint Resolution was passed.

This resolution reads in part as follows:

"JOINT RESOLUTION

TO PROVIDE FOR ANNEXING THE HAWAIIAN ISLANDS TO THE UNITED

STATES.

"Whereas the Government of the Republic of Hawaii having, in due form signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, Government or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands together with every right and appurtenance thereunto appertaining; therefore,

"Resolved by the Senate and the House of Representatives of the United States of America in Congress assembled, that said cession is accepted, ratified and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby annexed as a *part* of the territory of the United States, and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America." * * * * * * "The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may exist, or as may be hereafter concluded between the United States and such foreign nation. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this

Joint Resolution nor contrary to the Constitution of the United States nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine." 30 U. S. Statutes at Large p. 750.

On the 12th day of August, A. D., 1898, four days prior to the conviction of the petitioner, the ceremonies attending the formal transfer of the sovereignty and public property of the Republic of Hawaii occurred; the Hawaiian flag was lowered from the Capitol Building and the American flag raised into place. The public property was delivered to and accepted by the representative of the United States.

Prior to the signing of the resolution of annexation the Republic of Hawaii had been an independent sovereignty. She had long occupied a picturesque position among the governments of the world. Although annexation was brought about by the mutual efforts and in compliance with the desire of both governments when annexation became an accomplished fact, the Republic of Hawaii passed into history; there was no "union" or "marriage" as has been claimed, there was absorption—annihilation. In the language of the resolution "the Hawaiian Islands and their dependencies" were "annexed as a part of the territory of the United States," and at once became "subject to the sovereign dominion thereof."

The Joint Resolution further provided "until Congress shall provide for the government of such islands all the civil, judicial and military powers exercised by the officers of the existing government in said islands shall be vested in such person or persons and shall be exercised in such manner as the President of the United States shall direct; and the President shall have power to remove said officers and fill the vacancies so occasioned."

Chief Justice Taney says on the subject of newly acquired territory: "There is certainly no power given by the constitution to the federal government to establish, or maintain, colonies, bordering on the United States, or at a distance, to be ruled and governed at its own pleasure."

"The power to expand the territory of the United States by the admission of new states is plainly given, and, in the con-

struction of this power by all the departments of the government, it has been held to authorize the acquisition of territory not fit for admission at the time, but to be admitted as soon as its population and situation would entitle it to be admitted.

It is acquired to become a state, and not to be held as a colony, and governed by Congress with absolute authority.

A power therefore in the general government to obtain and hold colonies and dependent territories, over which they might legislate without restriction, would be inconsistent with its own existence in its present form. * * * *It cannot create for itself a new character, separate from the citizens of the United States, and the duties it owes them under the constitution. The territory being a part of the United States, the government and the citizens both enter it under the constitution,* with their respective rights defined and marked out; and the federal government can exercise no power over his person or property beyond what that instruments confers, *nor lawfully deny any right which it has reserved. * * * It could confer no power on any local government established by its authority to violate the provisions of the constitution." Scott v. Sandford,* 19 How. U. S. 450-1-2-3.

"It cannot be admitted that the King of Spain (said Justice Daniels) could by treaty or otherwise, impart to the United States any of his royal prerogatives; and much less can it be admitted that they have capacity to receive, or power to exercise them.

"*Every nation acquiring territory by treaty or otherwise must hold it subject to the constitution and laws of its own government,* and not according to those of the government ceding it." *Pallod's Lessees v. Hagan,* 3 How. 225.

In the license cases, 5 How. 613, Mr. Justice Daniel again said "Laws of the United States," in order to be binding, must be within the legislative powers vested by the constitution.

Treaties to be valid must be within the scope of the same powers for there can be no "authority of the United States" save what is derived mediately, or immediately, and regularly and legitimately from the constitution."

Chief Justice Marshall, speaking for the Supreme Court of the United States relative to the territory of Florida acquired by the United States by treaty from the King of Spain, said on the subject of the status of territory ceded by treaty: "The con-

stitution confers absolutely on the government of the Union the powers of making war and of making treaties. Consequently, that government possesses the power of acquiring territory, either by conquest or treaty. The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. *If it be ceded by treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed either on terms stipulated in the treaty of cession, or on such as its new master shall impose.*" *Am. Ins. Co. et. al. v. Canter*, 1 Pet. 542.

There was no "conquest" by force in the annexation of the Hawaiian Islands, nor "holding as conquered territory," they came to the United States in the same way that Florida did, to-wit, by voluntary cession, and the rule for determining their status is the same. The Hawaiian Islands became a part of the United States on the terms set forth in the Joint Resolution and on such terms "as its new master might impose;" not one or two years after the Resolution was in force and effect, *but at once,— immediately.*

The Resolution of annexation further provided that "the municipal legislation of the Hawaiian Islands  *  *  *  not inconsistent with the Joint Resolution, nor contrary to the Constitution of the United States shall remain in force until the Congress of the United States shall otherwise determine."

It seems clear from the authorities cited that the Hawaiian Islands were a part of the territory of the United States on the 16th day of August, 1898, as much so as the State of Indiana or the Territory of New Mexico.

Was the Constitution of the United States in force here then, or the 5th and 6th amendments, as claimed for the petitioner?

These amendments are as follows:

"No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment by a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be

twice put in jeopardy of life or limb; nor shall he be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty or prosperity, without due process of law; nor shall private property be taken for public use without just compensation." 5th Amend. U. S. Const.

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed (which district shall have been previously ascertained by law) and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defence." 6th. Amend. U. S. Const.

The government of the United States is one of delegated powers. The American nation, or, in the language of the constitution, "the people of the United States," is absolutely sovereign. This sovereign has prescribed certain fundamental rules, contained in the constitution of the United States, which its servants, the President and each member of Congress, must take a solemn oath to support and defend as a condition precedent to taking office. These servants are nowhere authorized to exercise absolute sovereignty but their powers are limited by the very terms of the constitution under which they hold their respective offices and discharge their official duties.

Mr. Justice McLean, speaking for the Supreme Court of the United States, said:

"The federal government is one of delegated powers. All powers not delegated to it, or inhibited by it to the states are reserved to the states, or to the people." *Briscoe v. Bank,* 11 Pet. 317.

Chief Justice Marshall said: "The Government, then, of the United States can claim no powers which are not granted to it by the constitution; and the powers actually granted must be such as are expressly given, or given by necessary implication." *Martin v. Hunter's Lessee,* 1 Wheat. 326.

Early in the constitutional history of the United States, (1820), Chief Justice Marshall, again speaking for the unanimous court on the question as to whether or not the provisions of the constitution extended to the District of Columbia, said as to the meaning of the term "United States":

. "Does this term designate the whole or any particular part of the American empire? Certainly this question can admit of but one answer. It is the name given to our great republic, which is composed of states and territories. The District of Columbia, or the territory west of the Missouri, is not less within the United States than Maryland or Pennsylvania; and it is not less necessary, on the principles of our constitution, that uniformity in the imposition of imposts, duties, and exercises should be observed in the one than in the other." *Loughborough v. Blake*, 5 Wheat. 317.

This opinion has stood as the decision of the highest court in the land for eighty years.

"Perhaps the power of governing a territory belonging to the United States, which has not by becoming a state acquired the means of self government may result from the fact, that it is not within the jurisdiction of any particular state, and is within the power and jurisdiction of the United States. The right to govern may be the inevitable consequence of the right to acquire territory. Whatever may be the source, whence the power is derived, the possession of it is unquestioned." *Am. Ins. Co. v. Canter*, 1 Pet. 542.

Again in the same opinion the Chief Justice says: "In legislating for them, Congress exercises the combined powers of the general and of a state government." 1 Pet. 540.

Chief Justice Waite says in *First Nat. Bank v. Yankton*, 101 U. S. 129: "All territory within the jurisdiction of the United States, not included in any state, must necessarily be governed by or under the authority of Congress. The territories are but political subdivisions of the outlying dominion of the United States.

"Congress is supreme, and, for the purpose of this department of its governmental authority, has all of the powers of the people of the United States except such as have been expressly or by implication *reserved in the prohibitions of the constitution.*

"It may do for the territories what the people under the constitution may do for the states."

Mr. Justice Curtis in his dissenting opinion in the Dred Scott case, says, on this subject: "If, then, this clause does contain a power to legislate respecting the territory, what are the limits of the power? To this I answer that in common with all other

legislative power of Congress, *it finds limits in the express prohibitions on Congress, not to do certain things*; that in the exercise of the legislative power Congress cannot pass an *ex post facto* law or bill of attainder and so in respect to each of the *other prohibitions contained in the constitution.*" 19 How. 614-15.

"The novel doctrine," says Lochren, U. S. District Judge for Dist. of Minn., "that the power of Congress to govern territory ceded to the United States may be conferred by a foreign sovereign, by and through the terms of a treaty of cession, and that the general government can exercise powers thus granted by a foreign sovereign, independent of and in disregard of the constitution, until Congress, mayhap, in the future, shall by its enactment, see fit to extend the constitution over the territory, is contrary to the holding of the Supreme Court of the United States above cited, to the effect that the general government is one of enumerated powers, and can claim and exercise no power not granted to it by the constitution, either expressly or by necessary implication.

"It is clear that the general government cannot legislate over territory where the constitution from which its every power is derived does not extend. The constitution must be in force over *territory before the general government can have any authority to legislate respecting it. No foreign sovereign can invest the general government with any legislative power.*

"The plain, obvious and undeniable fact is that the general government of the United States, created by the constitution and possessing no vitality or power not directly drawn from that instrument, can only exist and legislate where the constitution is in force, and that every tract of territory that comes under the sovereignty of the United States comes necessarily under that constitution which alone gives life to that sovereignty, and beyond which the sovereignty must cease." *Ex parte Oritz*, 100 F. 961.

The first ten amendments to the constitution of the United States have been called the Federal Bill of Rights. *Robertson v. Baldwin*, 165 U. S. 275. And it is well understood that none of these amendments were adopted to announce new principles or to declare and define new rights, but were intended to carry for-

ward and reaffirm the rights and privileges of freemen, well known and understood by the people who adopted them and whose ancestors had, at great sacrifice, forced their acknowledgment from the hand of unlimited power.

"The Bill of Rights is historically considered the most interesting part of these constitutions, for it is the legitimate child and representative of Magna Charta, and of those other declarations and enactments, down to the Bill of Rights of the Act of 1 William and Mary Session 2, by which the liberties of Englishmen have been secured. Most of the thirteen colonies, when they asserted their independence and framed their constitution, inserted a declaration of the fundamental rights of the people, and the example then set has been followed by the newer states and indeed by the states generally in their most recent constitutions."

*  *  * "A reason may be found in the remarkable constitutional conservatism of the Americans, and their fondness for the enunciation of the general maxims of political freedom." *  * *  *  * "They are therefore, it is held, still safeguards against tyranny and they serve the purpose of solemnly reminding a state legislature and its officers of those fundamental principles which they ought never to overstep." Bryce, The Amer. Com. (2nd Ed. 1891) vol. 1, pp. 422-3.

Mr. Justice Cooley says: "The truth is the Bill of Rights in the American constitutions have not been drafted for the introduction of new law, but to secure old principles against abrogation or violation. They are conservatory instruments rather than reformatory, and they assume that the existing principles of the common law are ample for the protection of individual rights, when once incorporated in the fundamental law and thus secured against violation." *Weimer v. Bunbury*, 30 Mich. 214.

Mr. Justice Matthews, speaking for the Court, said: "In this country written constitutions were deemed essential to protect the rights and liberties of the people against the encroachments of power delegated to their Governments, and the provisions of Magna Charta were incorporated into Bills of Rights.

*These were limitations upon all the powers of Government, legislative, as well as executive and judicial." Hurtado v. California*, 110 U. S. pp. 531-2.

Hon. George F. Edmunds, who is justly regarded as one of the greatest living expounders of the constitution, said: "But

the constitution as such, I suppose all admit, is not subject to the control of Congress, either to enlarge or to diminish, extend or contract, or to be applied to or withdrawn from any people or place. It is not a movable thing like the Ark of the covenant of the Israelites, to be set up and moved here or there as the tribes might wander. *It is the actual event and condition* and *not the legislative or executive will, that must, in the nature of things, determine the status of a man or a country under it.*

"The instances in which Congress has declared in statutes organizing territories that the constitution and laws should be in force there are no evidence that the constitution and laws were not already there, for Congress and all legislative bodies have often made enactments that in effect merely declared existing law. In such cases they declare a pre-existing truth to ease the doubts of casuists."

Letter to Senator Proctor, dated March 21st, 1900, and published in Congressional Record, March 30th, 1900, p. 3737.

We cannot assent to the doctrine that the operation of the constitution in the territories belonging to the United States depends upon the will or action of Congress extending it there. This doctrine necessarily carries with it the admission that what one Congress can give, the same or a succeeding Congress can take away; that although Congress by the Organic Act, organizing the Territory of Hawaii, extended the constitution and laws of the United States to this Territory, the next Congress might repeal that part of the Organic Act, and that then the people of this Territory would have none of the guarantees of life, liberty and property provided in the constitution and might thereafter be governed as a province, a Crown colony, or in any manner that Congress in its wisdom, or unwisdom, might provide; that a tariff might be levied on the products of the islands going into the states and citizens of this territory might be denied the rights and privileges of citizens of the United States residing in other parts of its imperial domain.

From the above citation of authorities we reach the conclusion that those negative provisions of the constitution, adopted to declare and protect the life, liberty and property of the

citizens were in force in the Hawaiian Islands as soon as the same became a part of the United States territory and subject to the "sovereign dominion thereof." It is not necessary in order to decide the case at bar to express an opinion as to whether the constitution *ex proprio vigore,* and as a whole, extends to and is in force in all territory subject to the sovereignty of the United States. It is clear and well settled, that some of the provisions of the constitution do not apply to the territories whether there is an Act of Congress expressly extending them there, or not, for the reason that they are totally inapplicable to the conditions existing in the territories. However, the ablest and most earnest advocates of the unlimited power of Congress to legislate for the territories, unrestricted by the provisions of the constitution, frankly admit that those negative provisions of the constitution inserted to protect the life and property of the citizen are in force in the territories and are so far a limitation on the power of Congress in legislating for the territories.

"It may be admitted," says Townsend, U. S. District Judge of Southern District of New York, "that the constitutional guarantees of civil rights would apply to the territory under the sovereignty, but not a part of the United States. Certain civil rights which we believe belong to every one *are crystalized into the negative provisions of our constitution* in order to prevent any wrongful and improper use of our power, and *these may be held to control our power wherever it reaches. These considerations may be found to limit us in governing any territory." Goetze v. United States,* 103, Fed. Rep. p. 85.

That some of those "negative provisions" are contained in the Fifth and Sixth Amendments to the constitution no one will deny, and it is equally clear to us that these were in force in the Hawaiian Islands on the 16th day of August, 1898, at the time of the trial and conviction of the petitioner.

Was the petitioner then denied any of the rights and privileges guaranteed thereby? That he was tried and convicted of an "infamous crime" no citation of authorities will be necessary to establish.

The question is not whether an indictment found by the Circuit Judge as provided by the laws of the Republic of Hawaii,

is as good a protection to the life and liberty of the citizen as one presented by a grand jury, but it is whether or not the Fifth amendment requires or guarantees to the citizen that he shall not be placed on trial for an infamous crime without an indictment by a grand jury.

Mr. Justice Gray said, "But if the crime of which the petitioner was accused was an infamous crime, within the meaning of the Fifth amendment of the constitution, no court of the United States had jurisdiction to try to punish him, except upon presentment or indictment by a grand jury." *Ex parte Wilson*, 110 U. S. 422.

The reason why a person so accused cannot be tried or punished in any "Court of the United States" and may be in a state court, is that the Federal Bill of Rights, or first ten amendments to the constitution, do not apply to the people of the states in making their state constitutions nor to the state legislatures in legislating for the states. But it is well settled that Congress in legislating for the territories is bound by these amendments. It cannot be seriously contended that Congress intended by the Joint Resolution of annexation, or did it in fact authorize the courts of the Hawaiian Islands to do what the courts of no other territory of the United States could do. After annexation the courts of the Hawaiian Islands exercised all their power and authority under the Joint Resolution and by direction of the President of the United States, and we may observe in this connection that the judges of the courts were required and did in fact take an oath to support the constitution of the United States.

Mr. Justice Gray further said in case last cited, "That no person can be held to answer, without presentment or indictment by a grand jury, for any crime for which an infamous punishment may be imposed by the court. The question is whether the crime is one for which the statute authorizes the court to award an infamous punishment, not whether the punishment ultimately awarded is an infamous one. When the accused is in danger of being subjected to an infamous punishment if convicted, he has the right to insist that he shall not be put on trial, except

upon the accusation of a grand jury." * * * "But the constitution, protecting every one from being prosecuted without the intervention of a grand jury for any crime which is subject by law to an infamous punishment, *no declaration of Congress is needed to secure, or competent to defeat, the constitutional safeguard." Ex parte Wilson*, 110 U. S. p. 426.

Mr. Justice Harlan in *Thompson v. Utah*, 170 U. S. 346, says: "That the provisions of the constitution of the United States relating to the right of trial by jury in suits at common law apply to the territories of the United States is no longer an open question."

Citing *Webster v. Reid*, 11 How. 437, 460; *Am. Pub. Co. v. Fisher*, 166 U. S. 464, 468; *Springville v. Thomas*, 166 U. S. 70-7.

"In the last named case it was claimed that the territorial legislature of Utah was empowered by the Organic Act of the territory of Sept. 9th, 1850, 9 U. S. St. Lt. 453, c. 57, por. 6, to provide that unanimity of action on the part of jurors in civil cases was not necessary to a valid verdict. That court said: "In our opinion the Seventh Amendment secured unanimity in finding a verdict as an essential feature of trial by jury in common law cases and the Act of Congress could not impart the power to change the constitutional rule, and could not be treated as attempting to do so. It is equally beyond question that the provisions of the national constitution relating to trial by jury for crimes and to criminal prosecutions apply to the territories of the United States, 170 U. S. pp. 346, 347.

"Assuming that the provisions of the constitution relating to trials for crimes and to criminal prosecutions apply to the territories of the United States, the next inquiry is whether the jury referred to in the original constitution and the Sixth amendment is a jury constituted, as it was at common law, of twelve persons, neither more or less. 2 Hale's P. C. 161; 1 Chitty's Cr. Law, 505. This question must be answered in the affirmative." *Thompson v. Utah*, 170 U. S. p. 349.

It will be remembered that Thompson was placed upon trial, after the admission of Utah as a state, for a felony, committed when Utah was a territory, and under the state constitution eight persons composed a lawful trial jury, and such a jury tried and found Thompson guilty. In the opinion last cited the court

further says: "Was it then competent for the state of Utah, upon its admission to the Union to do in respect to Thompson's crime what the United States could not have done while Utah was a territory, namely, to provide for his trial by a jury of eight persons? We are of opinion that the state did not acquire upon its admission into the Union the power to provide in respect to felonies committed within its limits while it was a territory, that they should be tried otherwise than by a jury such as is provided by the constitution of the United States. When Thompson's crime was committed, it was his constitutional right to demand that his liberty should not be taken from him except by the joint action of the court and the unanimous verdict of a jury of twelve persons. To hold that a state could deprive him of his liberty by the concurrent action of a court and eight jurors, would recognize the power of the state not only to do what the United States in respect to Thompson's crime could not, at any time, have done by legislation, but to take from the accused a substantial right belonging to him when the offense was committed." *Thompson v. Utah*, 170 U. S. pp. 350-1.

"It follows that all the provisions of the constitution in respect to personal and property rights, including the right to trial by jury in criminal prosecutions, became at once, when the cession was completed, a part of the supreme law of the land. The character of an offense and the measure of its punishment would be determined by the law in force when and where the act was committed, the laws of that character remain in force after the cession until changed; but *the manner of the trial must depend on the law in force when the trial is had, even though the establishment and organization of courts must be awaited before the trial can be had.*" *Ex parte Ortiz*, 100 Fed. p. 962.

Does this construction of the law mean, as has been so earnestly contended, that criminals should, of necessity, go unpunished and that there was no protection to life and property on the Hawaiian Islands between the 7th day of July, 1898, the date of signing the Joint Resolution, and the 14th day of June, 1900, the date the Organic Act went into effect? Certainly not. During all of this period there was organized Government here; there were officers and courts, legally constituted, continued in

office and existence by the order of President McKinley, under the authority given in the Joint Resolution. There was the great body of the municipal laws of the late republic "not inconsistent with the resolution, not contrary to the constitution of the United States," continued in force until Congress should otherwise direct. There was provision for a trial jury of twelve and that part of the statute authorizing nine jurors to return a verdict could have been controlled by a simple direction, or instruction of the trial court, that there must be a unanimous verdict to convict, and those additional safeguards to the life, liberty and property of the citizen prescribed by the constitution of the United States, were here in full force and vigor.

Among the municipal laws of the Republic of Hawaii continued in force was Sec. 1109 of the Civil Laws, which provide that the common law of England, as ascertained by English and American decisions, is declared to be the common law of the Hawaiian Islands, except when changed by decision, usage or law. The Circuit Court of the First Circuit was a Court of Record and of common law jurisdiction, and on August 16th, 1898, had the undoubted power to issue an open venire and summons and empanel a grand jury in the manner provided by the rules of the common law.

As Justice Cooley said: "They assume that the existing principles of the common law are ample for the protection of individual rights, when once incorporated in the fundamental law and thus secured against violation." *Weimer v. Banbury,* Mich. 214.

Chief Justice Marshall, speaking of the authority of Courts to issue an open venire, in the absence of any statute authorizing it, and of the law at that time, said. "It has been justly observed that no act of Congress directs grand juries, or defines their powers. By what authority then, are they summoned, and whence do they derive their powers.

The answer is, that the laws of the United States have erected Courts which are vested with criminal jurisdiction. This jurisdiction they are bound to exercise, and it can only be exercised

through the instrumentality of grand juries. They are, therefore, given by a necessary and indisputable implication.

But how far is this implication necessary and indisputable? The answer is obvious. Its necessity is co-extensive with the jurisdiction to which it is essential." *United States v. Hill*, 1 Brock. 159.

In *Clawson v. United States*, 114 U. S. 486, in approving the action of the Supreme Court of Utah, whose opinion sustained the action of a District Court of the territory in issuing an open venire for jurors and who based its judgment not on any statute authorizing it, but the fact that such "power was inherent in the Court and was not forbidden by any statute in force in Utah," said, "We concur in this view, so far as the resort to the open venire, after the exhaustion of the two hundred names, is concerned."

The following authorities also support this proposition: 1 Chitty, Crim. Law, 518; 2 Hale, P. C. 265; *Mackay v. People*, 2 Cal. 13; *Wilburn v. State*, 21 Ark. 198, 201; *Goodwin v. United States*, 54 Pac. 432.

Deciding only the questions presented by the case at bar, we hold that the Hawaiian Islands were a part of the United States on the 16th day of August, A. D. 1898; that the Fifth and Sixth Amendments to the Constitution of the United States were in force here at that time; that the petitioner having been put to his trial on the 16th day of August, A. D. 1898, upon an "indictment" found by a circuit judge, charging him with an infamous crime, and thereof convicted by a verdict of ten jurors, was thereby deprived of his constitutional rights, and his detention is illegal.

Let the writ issue and the petitioner be discharged.

*Davis and Gear*, attorneys for the petitioner.

*Hon. E. P. Dole*, Attorney-General, opposing.

### DISSENTING OPINION OF FREAR, C.J.

The questions now raised on *habeas corpus* were raised on exceptions by the same prisoner and decided by the unanimous judgment of the court on a rehearing adversely to him in *Repub-*

4

*lic v. Edwards,* 12 Haw. 55. I see no reason for changing my opinion as expressed in that case and in the case of *Peacock & Co. v. Republic,* 12 Haw. 27. In the *Peacock* case it was held that the provision of the Constitution which in terms requires that duties shall be uniform throughout the United States did not apply to the Hawaiian Islands during the transition period between the date of the annexation of these islands to the United States and the date of the establishment of a territorial government here by Congress; and in the *Edwards* case it was held, on the reasoning in the *Peacock* case, that the provisions of the Constitution requiring grand juries and unanimous verdicts of petit juries in certain cases did not apply here *ex proprio vigore* during that period, and further that they were not intended by Congress to be extended here by the terms of the Joint Resolution of Annexation.

There are two questions involved. First, a question of construction. Assuming that these provisions of the Constitution did not extend or apply here of their own force under the circumstances, did Congress intend by the Joint Resolution to extend them here? Upon this question of construction I shall add nothing to what is set forth in the decision in the *Edwards* case referred to, so far as the particular intention of Congress is concerned as determined by a consideration of particular clauses in the Joint Resolution. And as to the general intention of Congress, as shown by the Joint Resolution as a whole, that the laws of Hawaii as respects internal relations should continue unchanged, except in certain particulars, until further action by Congress, and that these islands, although subject to the sovereignty of the United States, were still to be regarded as, to some extent, foreign territory, I will merely quote portions of opinions of the Attorney-General of the United States. In 22 Op. 150, he says:

"The resolution of Congress which, with the corresponding action of the Republic of Hawaii, annexed the Hawaiian Islands to the United States, operated for international purposes to make those islands part of the territory of the United States. But when territory is acquired by treaty or conquest, or otherwise,

its relations to the nation acquiring it depend upon the laws of that nation unless controlled by the instrument of cession. It may for certain purposes remain foreign temporarily or permanently, and is not presumed to be at once put upon the same footing as all other territory of the nation, but rather the contrary.

"When, therefore, Florida had been ceded and fully transferred to the United States, its ports were regarded as foreign within the meaning of our revenue laws. (*Fleming et al v. Page,* 9 How. 617.)

"This being so, it seems to me we should be able to find some provision in the resolution annexing the Hawaiian Islands indicating an intention to change the relations of our tonnage-tax laws to Hawaiian ports and vessels coming from them, or those relations should be regarded as continuing.

"Such an intent I do not find in the general declaration annexing the islands as part of the territory of the United States. That declaration, there having been no treaty, is intended to have the effect of a treaty of cession merely. It is the act whereby the islands become, in a broad sense, subject to American sovereignty. How that sovereignty will regulate their status, with regard to itself and its laws, is not thereby intended to be determined.

"Neither do I think that the express declaration that our land laws and certain other laws shall not apply to the islands carries the implication that other laws shall apply to them upon the principle, often misunderstood, that the expression of one thing often excludes another.

"On the other hand, the resolution is replete with indications that temporarily the relations of the two countries are to continue practically unchanged. Even some of Hawaii's relations with other countries are so to continue; its government is still to exist and collect its revenues; its laws are to remain in force, however at variance with our laws, and the powers—civil, judicial and military—exercised by its officers are still to be exercised. It is, moreover, plainly apparent that Congress regards the establishment of an American government for and the extension of American laws to the islands as matters to be attended to in the future upon a consideration of the wide separation of the two countries in locality and character."

And in a later opinion, *Ib.* 249, referring to the former opinion, he says:

"And I reach the conclusion in that opinion that Congress

in respect to this and other questions has affirmatively indicated its intent that our laws (and I may now add the Hawaiian laws) are to remain generally undisturbed by the annexation of the islands until 'Congress shall provide a government for such islands,' or until a commission shall advise and Congress enact 'such legislation concerning the Hawaiian Islands as they shall deem necessary or proper.' "

The other question is one of constitutionality. This is a question of great difficulty. Probably it will never be regarded as settled until decided by the Supreme Court of the United States. As pointed out in the *Peacock* decision jurists differ widely in their views upon it. I shall not now undertake an exhaustive consideration of the question.

Not to make too minute a classification, territory acquired by the United States may be in any one of three stages before attaining the status of statehood. It may be acquired by conquest and ruled by military government before a treaty of peace and cession is concluded, as was the case with the Philippines for a time. It may be held after such treaty of peace and cession, as are the Philippines at present, or after cession without previous conquest, as were the Hawaiian Islands during the transition period referred to, without a determination of its status by Congress. And, thirdly, it may be held, as the Hawaiian Islands are now held, after its status has been determined by Congress by the creation of an organized territorial government or otherwise. The question now raised is that in regard to territory in the second of these stages.

It is conceded by all that the constitutional provisions in question do not apply to territory of the United States in the first of these stages.

As to whether they apply of their own force to territory in the third stage, jurists are divided. This has never been settled by judicial decision, although *dicta* may be found on both sides. The Supreme Court of the United States in so recent a case as that of the *American Publishing Co. v. Fisher*, 166 U. S. 464, (1896) said: "Whether the Seventh Amendment to the Constitution of the United States," which was held to require unani-

mous verdicts in certain cases, "operates *ex proprio vigore*" in the territories, "may be a matter of dispute;" and various previous opinions of the court, some pointing in one direction, some in the other, were cited to show the uncertainty upon the question so far as authority is concerned. It will be useless to review these *dicta* or the opinions of writers upon this subject. The question has called forth much discussion in the magazines during the last two years in view of the acquisition of islands in both the Atlantic and Pacific oceans teeming with peoples who in large measure are unacquainted with Anglo-Saxon ideas of civilization and government. As one example of the view that the Constitution does not apply *ex proprio vigore* in all its fulness to the territories I will cite the following passages from the speeches of that great authority on constitutional law and defender of the Constitution, Daniel Webster, in his debate with Mr. Calhoun, in the Senate of the United States, with reference to California and New Mexico, when those territories were in the second of the above mentioned stages, that is, after they had been ceded to the United States by treaty:

"My idea is, that the government, for the present, must be substantially a military government; that we can hardly do more than keep the peace, and protect the lives and property of individuals, until we either admit the people, who are freemen, as a State into this Union, or give them a regular Territorial government.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"There is a want of accuracy of ideas in this respect that is quite remarkable among eminent gentlemen, and especially professional and judicial gentlemen. It seems to be taken for granted that the right of trial by jury, the *habeas corpus*, and every principle designed to protect personal liberty, are extended by force of the Constitution itself over every new Territory. That proposition cannot be maintained at all. How do you arrive at it by any reasoning or deduction? It can only be arrived at by the loosest of all possible constructions. It is said this must be so, else the right of the *habeas corpus* would be lost. Undoubtedly these rights must be conferred by law before they can be enjoyed in a Territory. Sir, if the hopes of some gentlemen were realized, and Cuba were to become a possession of the United States by cession, does anybody suppose that the *habeas*

*corpus* and the trial by jury would be established in it by the mere act of cession? Why more than election laws and the political franchises, or popular franchises? Sir, the whole authority of Congress on this subject is embraced in that very short provision that Congress shall have power to make all needful rules and regulations respecting the Territories of the United States. The word is Territory; for it is quite evident that the Constitution looked to no new acquisitions to form new Territories. We have never had a Territory governed as the United States are governed. The legislature and the judiciary of Territories have always been established by a law of Congress. I do not say that, while we sit here to make laws for these Territories, we are not bound by every one of those great principles which are intended as general securities for public liberty. But they do not exist in Territories till introduced by the authority of Congress. These principles do not, *proprio vigore,* apply to any one of the Territories of the United States, because a Territory, while a Territory, does not become a part, and is no part of the United States.     *     *     *

"How did we govern Louisiana before it was a State? Did the writ of *habeas corpus* exist in Louisiana during its Territorial existence? Or the right to trial by jury? Who ever heard of trial by jury there before the law creating the Territorial government gave the right to trial by jury? No one. And I do not believe that there is any new light now to be thrown upon the history of the proceedings of this Government in relation to that matter. When new territory has been acquired it has always been subject to the laws of Congress, to such law as Congress thought proper to pass for its immediate government, for its government during its Territorial existence, during the preparatory state in which it was to remain until it was ready to come into the Union of the family of States.     *     *     *

"According to the gentlemen's reasoning, the Constitution extends over the Territories as supreme law, and no legislation on the subject is necessary. This would be tantamount to saying that, the moment territory is attached to the United States, all the laws of the United States as well as the Constitution of the United States become the governing rule of men's conduct, and of the rights of property, because they are declared to be the law of the land—the laws of Congress being the supreme law as well as the Constitution of the United States. Sir, this is a course of reasoning that cannot be maintained. The crown of England often makes conquest of territory. Who ever heard it

contended that the Constitution of England, or the supreme power of Parliament, because it is the supreme law of the land, extended over the territory thus acquired, until made to do so by a special act of Parliament? The whole history of colonial conquests shows entirely the reverse. Until provision is made by act of Parliament for a civil government, the territory is held as a military acquisition. It is subject to the control of Parliament, and Parliament may make all laws that they deem proper and necessary to be made for its government; but, until such provision is made, the territory is not under the dominion of English law. And it is exactly upon the same principle that Territories coming to belong to the United States by acquisition, or by cession, as we have no *jus coloniae*, remain to be made subject to the operation of our supreme law by an enactment of Congress." Curtis' Life of Daniel Webster, Vol. II., pp. 362, 365, 369.

Mr. Webster and associate counsel had previously taken the same position in their argument in the case of *American Ins. Co. v. Canter*, 1 Pet. 533, 538. Mr. Calhoun, of course, in the debate referred to, took the opposite position.

Even assuming that Congress in the exercise of its legislative power over organized territories is subject to fundamental limitations respecting personal rights, it would not necessarily follow that the provisions respecting grand juries and unanimous verdicts apply directly to such territories or even that they apply at all. Congress might be so limited only by general inference from the Constitution and the free and enlightened government of which it is the basis, and, if so, it would be limited only in so far as required by fundamental rights, to which class of rights the rights in question may not belong. As to limitations by inference rather than directly, the court in *Mormon Church v. U. S.*, 136 U. S. 1, said:

"Doubtless Congress, in legislating for the Territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives its powers, than by any express and direct application of its provisions."

And as to whether the rights in question are among the fundamental rights, *Holden v. Hardy*, 169 U. S. 366, may be

cited. In that case, while the court said, much as in the *Mormon Church* case, "that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice and an opportunity of being heard in his defence," yet it also said that "the law is, to a certain extent, a progressive science; that in some of the States methods of procedure, which at the time the Constitution was adopted were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been found to be no longer necessary;" that "in several of the States grand juries, formerly the only safeguard against a malicious prosecution, have been largely abolished, and in others the rule of unanimity, so far as applied to civil cases, has given way to verdicts rendered by a three-fourths majority;" that, quoting from a former decision, "while we take just pride in the principles and institutions of common law, we are not to forget that in lands where other systems of jurisprudence prevail, the ideas and processes of civil justice are also not unknown;" that "there is nothing in *Magna Charta*, rightly considered as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age;" and then, in the light of the foregoing, the court added this significant language:

"In the future growth of the nation, as heretofore, it is not impossible that Congress may see fit to annex territories whose jurisprudence is that of the civil law. One of the considerations moving to such annexation might be the very fact that the territory so annexed should enter the Union with its traditions, laws and systems of administration unchanged. It would be a narrow construction of the Constitution to require them to abandon these, or to substitute for a system, which represented the growth of generations of inhabitants a jurisprudence with which they had had no previous acquaintance or sympathy."

In other words, the court considered indictments by grand juries and convictions by unanimous verdicts as matters of procedure rather than of fundamental right; and in holding, as it has held, that indictments by grand juries are not required in the

States by the Constitution, even in murder cases, *Hurtado v. California*, 110 U. S. 516, *Bolln v. Nebraska*, 176 U. S. 83, and in apparently acquiescing in the view that verdicts by eight of the twelve jurors could be lawfully received in the States, even in criminal cases, *Thompson v. Utah*, 170 U. S. 343, it took the position that the "immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard" were not violated. The latest (January 15, 1900) expression by the Supreme Court of the United States upon this question is one of uncertainty—"whatever be the limitations upon the power of a territorial government"— uttered with reference to the power to permit prosecutions for felonies without indictments by grand juries. *Bolln v. Nebraska, supra.*

I am aware that it has been held that the provisions in question apply *ex proprio vigore* to the District of Columbia, or at least to congressional action with reference to such District. *Callan v. Wilson*, 127 U. S. 540; *Capital Traction Co. v. Hof*, 174 U. S. 1. The decisions in these cases go far to support the same view with reference to the territories, although the earlier decision was based in part upon the assumption, which has been shown above to be erroneous, that such had been decided with reference to the territories, and the later decision was based upon the earlier, and in the opinion of some writers the District of Columbia may be distinguished from the territories, especially those acquired after the adoption of the Constitution, with reference to the application of the Constitution. But assuming that there is no such valid distinction, still these decisions do not affect the present question, which relates to territory whose status has not been determined.

It is true also that it has often been held that these provisions of the Constitution were in force in the territories, but only because Congress had in each instance expressly provided, as it has now provided in the case of Hawaii, that the Constitution should have the same force and effect in the territory as elsewhere in the United States. I do not wish to be understood from the

foregoing as being of the opinion that the constitutional provi-
sions in question would not extend to the organized territories in
the absence of an act of Congress in terms extending them.   In-
deed, I believe that so far as *dicta* are concerned they support
the view that such provisions would so extend more strongly
than the opposite view.   The mere fact adequately shown in an
appropriate manner that Congress has determined the status of
the territory as an organized territory of the United States or as
fully incorporated for all purposes as a part of the United States
may be sufficient in itself.   I express no opinion upon this point.
What I do believe is that the question of the extension of such
provisions of their own force to even organized territories has
never been judicially decided and is generally regarded as not
having been settled.   But whatever may be the decision, if a
decision is ever made, as to whether these provisions of the Con-
stitution extend of their own force to organized territories, that
is not the question here presented.

The question here presented is whether these provisions apply
of their own force to territory of the United States in the middle
of the three stages above mentioned—territory acquired but
whose status has not been determined by Congress.

Upon this question some *dicta*, but no decisions, are cited in
support of the view that the constitutional provisions in question
do extend to territory under such circumstances.   These *dicta*
are for the most part entitled to little or no weight, partly be-
cause they are of a general character and uttered with reference
to territory not in this stage but in the third stage above men-
tioned, or with reference to other questions than those here in-
volved, and partly because as many and as satisfactory *dicta* of
the same general character may be found on the opposite side.
Such *dicta*, on which ever side found, are entitled to little weight
except as read in the light of the facts and the questions involved
in the cases in which they were uttered.   For instance, the fol-
lowing recent language of the United States Circuit Court of
Appeals for this Circuit, in *Endleman v. U. S.*, 86 Fed. 456,
(1898,) although on its face pointing strongly in the direction

that the provisions of the Constitution do not extend to the territories, has but little bearing on the present case:

"The answer to these and other like objections urged in the brief of counsel for defendant is found in the now well-established doctrine that the territories of the United States are entirely subject to the legislative authority of Congress. They are not organized under the constitution, nor subject to its complex distribution of the powers of government as the organic law, but are the creation, exclusively, of the legislative department and subject to its supervision and control. *Benner v. Porter*, 9 How. 235, 242. The United States, having rightfully acquired the territory, and being the only government which can impose laws upon them, has the entire dominion and sovereignty, rational and municipal, federal and state."

Nor is the opinion, often expressed, that Congress in legislating for the territories has the combined powers of the federal and of a state government, entitled to much weight in this connection, although if taken literally it would mean that Congress might do away with grand juries and unanimity of verdicts in the territories, for it is well settled that this may be done by a state government.

The United States are a sovereignty. It has under the Constitution power to acquire territory by conquest, treaty or act of Congress. The purposes for which, the extent to which, or the manner in which it may acquire territory are not limited by the Constitution. The sovereign power to acquire territory carries with it the incidental powers usually exercised by sovereignties in similar cases one of which incidental powers is the power to allow the newly acquired territory to remain for certain purposes foreign and not to regard it as at once put upon the same footing as other territory. This is the basis of the decision in the *Peacock* case. This power is not in derogation of the Constitution, nor does its exercise operate as a suspension of the Constitution. It is a power granted by the Constitution. It is founded on necessity and is granted by implication by the Constitution because a grant of the principal carries with it the incidental, and the Constitution was framed by reasonable men and with reference to established and known principles, and must

be construed with reference to such principles. This ground was gone over at length in the *Peacock* case and decisions as well as *dicta* and historical precedents were there adduced in support of it. There is no need of repetition here. It is supported by the practice of the executive department of the government in the numerous cases of annexation that have occurred since the adoption of the Constitution. It is supported by the treaties and acts of Congress by which territory has been acquired, and which were framed on that theory, as well as by subsequent acts of Congress determining the status of the acquired territory, which also have been framed on the theory that the existing laws of the acquired territory relating to internal relations had continued unchanged after annexation until further action by Congress. It is supported by the express language of the Constitution itself, for Sec. 3 of Art. 4 distinguishes between the "United States" and "territory belonging to the United States" and the Thirteenth Amendment distinguishes between the "United States" and "any place subject to their jurisdiction." It is supported by judicial decisions as shown in the *Peacock* case, to which may now be added the very latest decision, by United States District Judge Townsend in the case of *Goetze v. U. S.*, the text of which has not yet been received. To the quotations in the *Peacock* case but one will be added,—from the opinion, dated August 10, 1899, of the Attorney-General of the United States, 22 Op. 560:

"The right of the President as Commander in Chief of the Army and Navy of the United States under the Constitution to exercise government and control over Porto Rico did not cease or become defunct in consequence of the signature of the treaty of peace, nor from its ratification. It was settled by the judgment of the Supreme Court of the United States in a similar case arising out of the enforcement of local tariff laws in California subsequently to the cession of that territory and prior to any legislation with reference to it by Congress, that the civil government organized from a right of conquest by the military officers of the United States was continued over it as a ceded conquest without any violation of the Constitution or laws of the United States. (*Cross v. Harrison*, 16 Howard, 164.) According to the well-settled principles of public law relating to territory held by conquest, and according to the adjudication of

the Supreme Court of the United States in *Cross v. Harrison*, the military authorities in possession, in the absence of legislation by Congress, may make such rules or regulations and impose such duties upon merchandise imported into the conquered territory as they may, in their judgment and discretion, deem wise and prudent. But as to the admission of merchandise into the ports of the United States, that is governed solely by the existing laws passed by Congress, and the President is powerless either to add to or detract from the force and effect of such laws. If the laws require that merchandise introduced from the island of Porto Rico into the ports of the United States should pay the same duties that would be charged upon similar merchandise imported from those countries which are distinctly foreign, then the President is powerless to remit such obligation. The question, therefore, to be decided, relates not to the power of the President in the matter, but to the law of the United States governing the introduction of merchandise at their domestic ports. Its solution depends upon whether Porto Rico is to be considered, as to the customs laws of the United States, domestic or foreign territory. The facts of the case are, fortunately, not without parallel, and the question has practically been authoritatively disposed of by the judgment of the Supreme Court of the United States. The authority to which I refer is *Fleming v. Page*, 9 Howard, 603. This case was decided in 1850, the opinion of the court being rendered by Chief Justice Taney. The case involved the legality of the exaction of duties at the port of Philadelphia on merchandise imported into that port from Tampico, Mexico, in March and June of 1847, when Tampico was in the military possession of the United States as conquered territory. 'By the laws and usages of nations,' said the Chief Justice, 'conquest is a valid title while the victor maintains the exclusive possession of the conquered country. The citizens of no other nation, therefore, had a right to enter it without the permission of the American authorities, nor to hold intercourse with its inhabitants, nor to trade with them. As regarded all other nations, it was a part of the United States, and belonged to them as exclusively as the territory included in our established boundaries. But yet it was not a part of this Union. And the relation in which the port of Tampico stood to the United States while it was occupied by their arms did not depend upon the laws of nations, but upon our own Constitution and acts of Congress.' * * * The Chief Justice then refers to the uniform construction of the revenue laws given by the Executive Departments of the Government in

all similar cases that had previously arisen, and concludes as follows:

" 'This construction of the revenue laws has been uniformly given by the administrative department of the Government in every case that has come before it. And it has, indeed, been given in cases where there appears to have been stronger ground for regarding the place of shipment as a domestic port. For after Florida had been ceded to the United States, and the forces of the United States had taken possession of Pensacola, it was decided by the Treasury Department that goods imported from Pensacola before an act of Congress was passed erecting it into a collection district, and authorizing the appointment of a collector, were liable to duty. That is, that although Florida had, by cession, actually become a part of the United States, and was in our possession, yet, under our revenue laws, its ports must be regarded as foreign until they were established as domestic by act of Congress; and it appears that this decision was sanctioned at the time by the Attorney-General of the United States, the law officer of the Government. And although not so directly applicable to the case before us, yet the decisions of the Treasury Department in relation to Amelia Island and certain ports in Louisiana, after that province had been ceded to the United States, were both made upon the same grounds. And in the latter case, after a custom-house had been established by law at New Orleans, the collector at that place was instructed to regard as foreign ports Baton Rouge and other settlements still in possession of Spain, whether on the Mississippi, Iberville, or the sea-coast. The Department in no instance that we are aware of, since the establishment of the Government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress.

" 'The principle thus adopted and acted upon by the executive department of the Government has been sanctioned by the decisions in this court and the circuit courts whenever the question came before them. We do not propose to comment upon the different cases cited in the argument. It is sufficient to say that there is no discrepancy between them. And all of them, so far as they apply, maintain that, under our revenue laws, every port is regarded as a foreign one unless the custom-house from which the vessel clears is within a collection district established by act of Congress, and the officers granting the clearance exer-

cise their functions under the authority and control of the laws of the United States.'

"The authority of this decision, so far as I know, has never been expressly questioned. It appears from the statements of the Chief Justice that this view of the law had guided the Executive Departments in dealing with the same question in the administration of the ceded territories of Louisiana and Florida.

"There are certain expressions in the opinion of Mr. Justice Wayne in the case of *Cross v. Harrison* (16 Howard, 164) which would appear to be in conflict with the views expressed by the Chief Justice in the case of *Fleming v. Page*. But these expressions are in the nature of *obiter dicta*, and although *Cross v. Harrison* was decided in 1853, the opinion of Mr. Justice Wayne makes no reference whatever to the decision of *Fleming v. Page*. If he had intended in any wise to overrule the decision established by *Fleming v. Page*, it is inconceivable that he would not have referred to it expressly and have given some discussion of the reasons why a judgment in which he concurred three years previously was thus to be set aside. The point decided in *Cross v. Harrison* was that the formation of a civil government in California was the lawful exercise of a belligerent right over a conquered territory; that this government did not cease as a consequence of the restoration of peace, and was rightfully continued until Congress legislated otherwise; and that the tonnage duties and duties upon foreign goods imported into San Francisco were legally demanded and lawfully collected by the civil government whilst the war continued, and afterwards from the ratification of the treaty of peace until the revenue system of the United States was put into practical operation in California under the acts of Congress passed for that purpose. The decision harmonizes with the principles laid down by Chief Justice Taney in *Fleming v. Page*, the only apparent divergence arising from the dicta of Mr. Justice Wayne above referred to.

"The practice that prevailed with reference to Louisiana and Florida has been followed by the executive department of the Government thus far in relation to all the recently acquired territory of the United States in the West Indies and the Pacific ocean. The resolution of Congress of July 7, 1898, providing for the annexation of the Hawaiian Islands expressly declared that the existing customs relations of these islands with the United States and other countries should remain unchanged until legislation should be enacted extending the United States customs laws and regulations to them. This was only declaratory of

what would have been without expression the proper construction of the resolution, so far as the tariff laws of this country are concerned. And the failure of Congress to extend by express enactment the customs laws of the United States to Porto Rico and the other islands ceded by Spain after the ratification of the treaty of Paris, in view of the fact that the executive department was following the precedents cited, and requiring the payment of our tariff rates on merchandise imported from those places, may fairly be taken as indicative of the opinion of Congress that it desired for the present to have that practice continued."

The fact that grand juries or unanimity of verdicts might have been possible here under the existing conditions of civilization and by the exercise of common law powers and in consequence of an implied repeal of some of our statutes, does not alter the case. The principle I rely on though founded on necessity rests on broader ground than supposed actual necessity in any particular instance. It rests upon the general rule applicable to all cases of acquisition of territory, a rule adopted by implication in the Constitution, as a rule of public law applicable to such cases and incidental to the power of acquiring territory. One provision of the Constitution is not to be extended here because it can be conveniently enforced, and another not, because it cannot be enforced. Nor is one provision to apply here because it can be enforced and not to apply in the Sulu islands because it cannot be enforced there under existing conditions. The operation of the Constitution does not depend on circumstances merely of convenience or supposed necessity in particular instances. But the application of particular provisions of the Constitution may depend upon general conditions to which are applicable established rules founded upon necessity. To illustrate, during the civil war President Lincoln established courts in Louisiana for the trial of cases, both civil and criminal, such as could be tried in times of peace by the ordinary courts alone. The Supreme Court held this lawful as a valid exercise of an incidental war power—founded on necessity. *The Grapeshot*, 9 Wall. 129. It was immaterial whether or not there were any juries, whether grand or petit, or whether the parties were civilians or in the military forces. The legality of the exercise of the power did not

depend upon whether the ordinary federal courts, which under the Constitution could have been established by Congress alone, or the State courts, which could have been established by the State legislature alone, could have exercised jurisdiction, or whether indictments by grand juries or trials by petit juries were possible, in any particular instance or during the particular period, but upon whether it was a case for the exercise of military government, one of the incidents of which is the right to establish provisional courts for the trial of cases. To quote from the *Peacock* decision:

"The Constitution contains many provisions intended as safeguards of the fundamental rights of life, liberty and property, and yet these may of necessity be entirely disregarded under certain circumstances in time of war—not because necessity authorizes a breach of the Constitution, but because it makes that constitutional or lawful which would otherwise be unconstitutional or unlawful, in other words, because it is only another name for a difference of circumstances and the law applicable to one set of circumstances is not applicable to an essentially different set of circumstances. Expressed in another way, the Constitution itself provides for a state of war as well as a state of peace and the law applicable to a state of war, as determined by the usages and customs of nations, differs from the law applicable to a state of peace."

As, in the exercise of war powers, trials may be had without indictments by grand juries or verdicts by petit juries, not because trials with these cannot be had in the particular instance, but because trials without these may be had under the general conditions of war on the theater of military operations as incidental to the exercise of war powers, so such trials may be had under the existing laws in newly acquired territory as incidental to the acquiring power—without reference to whether it is possible to do otherwise in any particular instance. Such trials may be had under, not in breach of, the Constitution.

It is objected that the doctrine that the Constitution does not apply until Congress has taken certain action, involves the proposition that the operation of the Constitution under the circumstances depends upon the will of Congress and necessarily car-

ries with it the admission that what one Congress can give, the same or another can take away. If the doctrine did involve that it would not be fatal to the doctrine. It may indeed be that Congress could terminate the operation of the Constitution in territory belonging to the United States, as for instance, by granting the Philippines independence or ceding them to some other power,—especially if the provision of the Constitution that, "The Congress shall have power to dispose of  *  *  * the territory  *  *  *  belonging to the United States," applies to territory acquired since the adoption of the Constitution. But the doctrine does not necessarily involve that any more than the doctrine, which is unquestioned, that Congress may determine the status of newly acquired territory as a State by admitting it into the Union as such, the effect of which is to make applicable to it certain provisions of the Constitution which would otherwise not be applicable, involves the admission that the same or another Congress may withdraw the operation of those provisions either by ordinary statute or by expelling the State from the Union.

It is further objected that since all powers of the national government are derived from the Constitution, new territory can be acquired, held and governed only under the Constitution, and that if any portion of the Constitution extends to the new territory all must extend, and that therefore as soon as any territory becomes subject to the sovereignty of the United States, it must at once become subject to all the provisions of the Constitution, and that the distinctions that are often made as to the extent of the operation or application of particular provisions of the Constitution are imaginary.

The question is not so much of the extension of the Constitution as of the application of particular provisions under particular circumstances. It is perfectly true that all powers of the national government are derived, expressly or by implication, from the Constitution and that therefore new territory can be acquired, held and governed only under the Constitution. As was said in the former *Edwards* decision—"it might well be

argued that certain provisions of the Constitution did so extend, for these islands were annexed and are now held and governed by powers conferred by the Constitution either expressly or by implication." May it not be that at least that clause applies which provides that, "The Congress shall have power to * * * make *all* needful rules and regulations respecting the territory * * * of the United States?" But it by no means follows that all the provisions of the Constitution are applicable. It is settled beyond controversy that the provisions in question relating to juries and trials by jury are not applicable to the case of territory in the first of the three stages above mentioned, that is, during the period of military government of conquered territory before a treaty of peace is concluded, which stage may continue indefinitely. No treaty of peace need ever be concluded. And yet the President in the administration and establishment of military government in such territory acts under the Constitution, just as truly as he does in the administration of government after a treaty of peace is concluded or after a cession not preceded by conquest and prior to action by Congress—for all his powers are derived, directly or indirectly, from the Constitution. It is equally well settled that the provisions in question do not apply on the field of war even in the States proper themselves. And yet the President acts in such cases under the Constitution. He could not act otherwise. . These two exceptions to the application of the provisions in question have been recognized by repeated decisions of the Supreme Court of the United States. In each of such cases the territory is subject to the sovereignty of the United States but it is not therefore subject to all the provisions of the Constitution. Still another instance, having no connection with war, may be cited to show that subjection to the sovereignty of the United States does not necessarily require the application of the Constitutional provisions in question. In *Talton v. Mayes*, 163 U. S. 376, (1895) the Supreme Court of the United States held that the constitutional provision relating to grand juries did not apply to the Cherokee nation in the Indian Territory, but that a sentence of death upon a conviction of mur-

der upon an indictment found by a grand jury of only five persons under the laws of that nation was constitutional. And yet such laws were enacted under the authority of statutes passed by Congress and treaties having the force of statutes only, and the court expressly said that the Cherokee nation was subject to the general provisions of the Constitution and to the paramount authority of Congress. The territory occupied by that tribe was a part of the territory of the United States and subject to the sovereignty of the United States. Congress was free at any time to erect it into an organized territory of the United States, or to give it the status of statehood, but nevertheless it was held that the Fifth Amendment did not apply and that it lay in the discretion of Congress to allow that people in that territory to continue to govern itself as it did before the Constitution was adopted or extended to it, until the Congress should otherwise determine. I may add incidentally as bearing upon the other question involved in this case—that of the construction of the Joint Resolution—that it was expressly provided in the treaty under which the Cherokees made their laws that such laws should "not be inconsistent with the Constitution of the United States."

The truth is that careful discrimination must be exercised in considering questions of the application of the various provisions of the Constitution. The language of the clause in question, the light thrown upon it by other clauses, the spirit of the Constitution as a whole, and the historical setting must all be carefully studied. Some provisions indicate clearly the extent of their application, others do not; some are absolute, others are qualified; some clearly relate to the States alone, others as clearly to the United States alone; some to only one department of government, others to all departments; some to one state of facts, others to another; some are grants of power, others are inhibitions; some appear to apply to particular territory only, others to all territory subject to the jurisdiction of the United States. Some of the provisions in question are among the most uncertain as to the extent of their application. That relating to grand juries reads:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger." 5th Amend.

Those which by implication require unanimous verdicts of petit juries in criminal cases are:

"The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crimes shall have been committed; but when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed." Art. 3, Sec. 2.

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." 6th Amend.

Do these provisions relate to the federal government alone or to both federal and state governments? If to the federal government alone, do they apply under all circumstances or to all departments of the government or only under certain circumstances or to certain departments of the government? Do they limit the power of Congress however or in respect of whatever territory exercised, or do they limit it only when exercised in respect of crimes committed or tried in United States territory? Do they limit all powers that are subject to the paramount authority of Congress, even though Congress may not have exercised its authority, or do they limit only the action of Congress itself?

The last of these constitutional provisions, that is, the first portion of the Sixth Amendment, which is the portion relied on by the petitioner, contains evidence in itself that it does not apply to the territories, and accordingly the Supreme Court of the United States has definitely decided that it does not apply to the territories. *U. S. v. Dawson*, 15 How. 467. The other provision relating to petit juries contains in itself some evidence pointing in the same direction. But the provision relating to grand juries is very general in its terms. And yet although this is in terms apparently unlimited in its application as between

state and federal governments, it is settled beyond controversy that it does not apply to the state governments. *Barron v. Baltimore*, 7 Pet. 243. It is indeed settled that none of the first ten Amendments apply to the States. This conclusion has been reached largely from historical considerations and from inferences from the Constitution as a whole. The Constitution and its Amendments were framed and adopted by the people of the States for themselves and was not to be taken as limiting their powers over themselves except in so far as clearly so indicated. If they wished to permit trials in criminal cases without indictments by grand juries, why should they not be allowed to do so? If they did not so wish, they could so provide in their State constitutions. But they did not wish to bind themselves to such an extent to another sovereignty, the federal government. May not somewhat similar reasoning be applicable to the territories? This has never been decided. If these provisions do not apply to the States because the Constitution was made by the people of the States for themselves and because they did not wish to give to the federal government a control over themselves in matters which they thought might better be left to local action, might not there be even more reason for holding a similar view with reference to the territories on the ground that the people of the territories also might better be permitted to decide for themselves such matters and that they had no voice in making the Constitution and that the people of the States intended merely to protect themselves against action by the federal government, a different sovereignty, and not to tie the hands of that government with respect to the people of the territories—the only government which held sovereignty over those people—people who were not in the minds of the framers of the Constitution and with respect to whom the people of the several States had directly nothing to do? There are indeed some internal evidences in the Constitution that such was the intention. For instance, it is clear that the word "people" in the preamble of the Constitution does not include the people of the territories, and the same word is found in several of these ten Amendments. Should it not receive the same construction there? But as to this I express

no opinion. What I wish to show is that the real extent of the application of the provisions of the Constitution is not always determined by the apparent extent as determined by their language alone, and to show that there is at least considerable ground for holding that none of the provisions in question apply of their own force even in the case of organized territories. They do not apply to the States although not limited by their terms to the federal government.

The Thirteenth Amendment prohibits slavery not only in the "United States," but in "any place subject to their jurisdiction." Whether this would apply to territory in the middle of the stages above mentioned, I need not undertake to say. I took no part in the decision in *Honomu Sugar Co. v. Sayewiz*, 12 Haw. 96, in which it was held that this provision did not apply in such case. Nor need I express any opinion upon the question whether, if it did apply, the contract labor laws formerly in force here were repugnant to that provision of the Constitution. There is much in the decision in *Robertson v. Baldwin*, 165 U. S. 275, in support of the view that they were not. But if the Thirteenth Amendment should be held to apply to territory in the middle stage, it could be so held because of its peculiar wording. The very fact that it was deemed necessary to expressly make it apply to "any place subject to their jurisdiction" as well as to the "United States" may be taken as a constitutional construction that if that clause were not added, the amendment would apply only to the "United States" and not to places not included in the United States though subject to their jurisdiction. A decision that that Amendment applies to territory in the second or middle stage above mentioned would not affect the argument as to the provisions now in question. That Amendment applies to the States as well as to the territories. The provisions in question have been held not to apply to the States.

It being held that these Amendments relate to the federal government alone as distinguished from the State governments, do they apply under all circumstances or to all departments of the federal government or only under certain circumstances or to only certain departments? In this respect also some of these pro-

visions are on their face unlimited. No doubt they apply to acts of Congress passed with reference to the federal courts under ordinary circumstances. But as we have already seen they do not apply to acts of the President done in the exercise of his war powers either in foreign territory or in the States themselves, nor, I may add, to the exercise of the war power by Congress itself. This is because the power to establish provisional courts under certain conditions is incidental to and necessarily implied from the war powers granted. If so, is there any inherent reason why the practice usually followed in cases of acquisition of territory, of allowing the existing judicial procedure in the acquired territory to continue for a time, should not be permitted as an incident of the power to acquire?

Again, do these provisions limit the power of Congress however or in respect of whatever persons or territory exercised, or do they limit it only when exercised in respect of crimes committed or tried in United States territory? Here again some of these provisions contain no express restrictions. And yet it is held, *In re Ross*, 140 U. S. 453, that an American citizen could constitutionally be tried, under statutes passed by Congress, for murder committed on an American vessel and be sentenced to death in an American consular court, in Japan, without any indictment by a grand jury or any trial by a petit jury, on the ground that the constitutional provisions in question did not limit the powers of Congress with respect to regions outside of the United States. This decision also was based largely on historical considerations and the established practice of nations in such cases, with reference to which the framers of the Constitution were presumed to have acted. That view was supported by the fact that such practice in the case of the United States had been acquiesced in by the executive and legislative departments of the government for thirty years. Indeed the Circuit Court had based its decision on this practice rather than on its own independent judgment, deeming it wisest in view of such practice to leave the question of the validity of the trial and judgment to be determined by the Supreme Court of the United States on

appeal rather than to discharge the prisoner and allow him to get beyond the jurisdiction of the court.

Lastly, do these provisions limit all powers that are subject to the paramount authority of Congress, even though Congress has not exercised its authority or do they limit only the action of Congress itself? In *Talton v. Mayes, supra,* the Supreme Court held that these provisions did not apply to trials under the laws of the Cherokee nation, although that tribe not only was on territory of the United States but was subject to the paramount authority of Congress. In that case Congress did not itself pass the laws nor in a certain sense did it grant the Cherokees authority to do so; it rather merely permitted the Cherokees to legislate for themselves and conduct their trials as they pleased just as they had done before their territory became United States territory. That is, although Congress had supreme control over the Cherokees and their territory, and such territory was United States territory and completely subject to the sovereignty of the United States, yet it was held that Congress might permit them to remain practically in the position of a foreign nation as regards trials and various other internal matters. Why could not Congress equally lawfully and constitutionally permit Hawaii or Porto Rico or the Philippines to remain in the position of foreign territory for similar purposes until such time as it deemed it best, or had an opportunity, to terminate such status by appropriate legislation?

Thus we have seen that in at least four different classes of cases the Supreme Court of the United States has held that these constitutional provisions do not apply, although there was nothing in the language of one or more of them to so indicate in any one of the classes of cases. In each class the decisions have been based largely upon historical grounds, and in most instances largely upon the ground that the Constitution should be construed in the light of the usages and practice of nations, with reference to which it must be presumed to have been framed by the wise men who performed that difficult task and who were acquainted with such usages and practice, and who evidently intended to provide a government for a nation with sovereign

powers that could command the respect of other nations and that would be equipped with the powers necessary to its preservation and progress.

The recent opinion of United States District Judge Lochren, *In re Ortiz*, 100 Fed. 955, is relied on *contra*. In that case the prisoner, a civilian, was tried and convicted of murder in Puerto Rico by the military authorities of the United States after that island had been captured by the forces of the United States but before the treaty of peace with Spain had taken effect. The Judge held that the prisoner was lawfully tried and convicted, though without an indictment by a grand jury or a trial by a petit jury. But he also expressed the opinion, *obiter dictum*, that if the trial had taken place after the treaty had been ratified, the conviction would have been unconstitutional. The reasons given by him in support of his opinion are answered above though without special reference to his opinion. On the other hand may be cited the more recent decision by United States District Judge Townsend in *Goetze v. U. S., supra*, holding that even after the ratification of the treaty ceding Puerto Rico to the United States the provision of the Constitution that "all duties, imposts, and excises shall be uniform throughout the United States," did not apply to that island, but that the island was still to be regarded as foreign territory with respect to duties. Indeed, the argument that the constitutional provisions in question extended here merely because these islands were a part of the United States territory can not be sustained. It is in conflict with too many decisions—decisions not only in the above cited cases relating to State governments, to military government on United States territory and to the Cherokee government, in respect of each of which cases, no language is found in some of the constitutional provisions in question as to the territory to which they are applicable, but also decisions under provisions which refer expressly to the "United States" such as that just quoted relating to duties, and others such as, for instance, that relating to "The judicial power of the United States," which not only clearly does not include the judicial power of the several States but has

been held repeatedly not to include the judicial power in the territories even when exercised by courts created solely by Congress. Even those courts, usually spoken of as federal courts, which exercise in a territory the jurisdiction of both District and Circuit Courts of the United States, such as that now established in these islands and officially known as the District Court of the United States, do not exercise any of "the judicial power of the *United States*" within the meaning of this provision of the Constitution. *McAllister v. U. S.*, 141 U. S. 174. They are established by Congress in the exercise of its general power (under the Constitution, of course) over territories.

There is no need of prolonging the discussion. In the case of *In re Ross*, above cited, the Circuit Court of the United States, in view of the acquiescence of the executive, administrative and legislative departments of the government for a period of thirty years in the trial, conviction and punishment of citizens of the United States by United States consular tribunals without preliminary indictment or common-law juries, took the view that it

"Ought not to adjudge that the sentence imposed on the petitioner, and modified by the president, was utterly unwarranted and void, when the case is one in which his rights can be adequately protected by the supreme court, and when a decision by this court, setting the petitioner at liberty, although it might be reversed, would be practically irrevocable." 44 Fed. 165.

The Supreme Court seems to have approved of such course. In the present case, I might well say, in somewhat similar language, that, in view of the acquiescence of the executive, administrative and legislative departments of the government of the United States for a period of nearly a century in the trial, conviction and sentence of criminals by the courts of territories acquired but whose status had not been determined by Congress, without indictments by grand juries or unanimity of verdicts by petit juries, I ought not to adjudge that the sentence imposed on the petitioner is utterly unwarranted and void, when the case is one in which his rights can be adequately protected by the Supreme Court of the United States, and when a decision by this court, setting the petitioner at liberty, although it might be

reversed, would be practically irrevocable, and might result, through a possibly erroneous decision, in the liberation of all criminals who are still serving their sentences and who were tried in cases of infamous crimes without preliminary indictment or were convicted in any case by less than a unanimous verdict of a petit jury during the nearly two years intervening between the annexation of these islands to the United States and the establishment of a Territorial government here by Congress.

Since the foregoing was written, the text of the decision in *Goetze v. United States*, 103 Fed. Rep. 72, has been received. It is strongly confirmatory of the above reasoning and the reasoning in the *Peacock* case above referred to.